Theresa C. WEBORG, individually and as
Personal Representative of the Estate of
William N. Weborg, deceased, Nicholas Weborg,
by his Guardian ad Litem, J. Michael End,
Mitchell Weborg, by his Guardian ad Litem,
J. Michael End and Michael Weborg, by his
Guardian ad Litem, J. Michael End,
Plaintiffs-Appellants-Petitioners,

v.

Donald B. JENNY, M.D., Erik M. Borgnes, M.D.,
Joseph J. Rebhan, M.D. and Physicians Insurance
Company of Wisconsin, Inc.,
Defendants-Respondents.†

Supreme Court

*No. 2010AP258. Oral argument March 13, 2012.
—Decided June 28, 2012.*

2012 WI 67

(Also reported in 816 N.W.2d 191.)

† Motion for reconsideration filed 7/18/12.

672

For the plaintiffs-appellants-petitioners, there briefs by *J. Michael End, End, Hierseman & Crain, LLC*, Milwaukee, and oral argument by *J. Michael End.*

For the defendants-respondents, there was a brief filed by *Michael Van Sicklen* and *Krista Sterken, Foley & Lardner, LLP*, Madison, with oral argument by *Michael Van Sicklen.*

Amicus curiae briefs were filed by *Guy DuBeau* and *Axley Brynelson, LLP*, Madison, for the Wisconsin Medical Society, Inc., and the Wisconsin Hospital Association, Inc., and *Martha Heidt, Bye, Goff & Rohde, Ltd.*, River Falls, for the Wisconsin Association for Justice.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished decision of the court of appeals, *Weborg v. Jenny*, No. 2010AP258, unpublished slip op. (Wis. Ct. App. June 2, 2011), that affirmed three judgments entered on a jury verdict by the Door County Circuit Court, D. Todd Ehlers, Judge.

¶ 2. On September 26, 2004, at the age of 42, William Weborg died of severe coronary artery disease. His surviving wife, Theresa Weborg, and three minor sons, by their guardian ad litem, (collectively, the We-

borgs) commenced a medical malpractice action against Dr. Donald B. Jenny; Dr. Erik M. Borgnes; Dr. Joseph J. Rebhan; their insurer, Physicians Insurance Company of Wisconsin, Inc.; and the Injured Patients and Families Compensation Fund (collectively, the physicians), claiming that the three physicians were negligent in their care and treatment of William, resulting in his death.

¶ 3. The case proceeded to a jury trial. Over the Weborgs' objection, the circuit court granted the physicians' motion in limine under Wis. Stat. § 893.55(7) (2009–10)[1] to introduce at trial evidence that Theresa Weborg received over $1.4 million in life insurance proceeds and $3,300 per month in social security benefits as a result of her husband's death. Subsequent to the admission of such evidence, however, the parties stipulated to the amount of damages, leaving the jury to decide only questions of liability.[2] Also relevant to this appeal, the circuit court granted the physicians' request to modify the standard jury instruction on expert testimony.

¶ 4. The jury returned a verdict in favor of the physicians, finding that neither Dr. Jenny, Dr. Borgnes, nor Dr. Rebhan was negligent in his care and treatment

---

[1] Wisconsin Stat. § 893.55(7) (2009–10) states:

> Evidence of any compensation for bodily injury received from sources other than the defendant to compensate the claimant for the injury is admissible in an action to recover damages for medical malpractice. This section does not limit the substantive or procedural rights of persons who have claims based upon subrogation.

All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

[2] As part of the stipulation, the Weborgs agreed to dismiss with prejudice their claims against the Injured Patients and Families Compensation Fund. The Fund is therefore not party to this appeal.

676

of William Weborg. The circuit court entered three judgments on the jury verdict and dismissed the Weborgs' complaint against the physicians.

¶ 5. The Weborgs appealed, arguing that the circuit court committed reversible error in admitting the evidence of life insurance proceeds and social security benefits and in modifying the standard jury instruction on expert testimony. The court of appeals assumed, without deciding, that the circuit court erred in admitting the evidence of collateral source payments and agreed that the circuit court erred in modifying the jury instruction. Nevertheless, the court of appeals affirmed the judgments, concluding that both errors were harmless.

¶ 6. We granted the Weborgs' petition for review and now affirm.

■■

¶ 7. First, we hold that evidence of collateral source payments is admissible under Wis. Stat. § 893.55(7) only if the evidence is relevant. In a medical malpractice action, evidence of collateral source payments is relevant if it is probative of any fact that is of consequence to the determination of damages. In this case, the circuit court admitted the evidence of life insurance proceeds and social security benefits without first determining in its discretion whether either piece of evidence was relevant to the jury's determination of damages. Because the circuit court applied an improper legal standard in admitting the evidence of life insurance proceeds and social security benefits, we conclude that the circuit court erroneously exercised its discretion.

¶ 8. However, considering the trial as a whole, we conclude that the circuit court's error in admitting the evidence of life insurance proceeds and social security

677

benefits did not affect the Weborgs' substantial rights and was therefore harmless.

¶ 9. Second, we conclude that the circuit court erroneously exercised its discretion in modifying the standard jury instruction on expert testimony. Again, however, we determine that the error was harmless.

## I. FACTUAL BACKGROUND

¶ 10. Prior to his death, William Weborg lived with his wife and their three sons in the Village of Ephraim in Door County. Since graduating from high school, William worked at a small machine shop in Egg Harbor. William purchased the shop in October 2003, nearly one year before he died.

¶ 11. On March 22, 2004, William developed heaviness in his chest while exercising. Two days later, he was evaluated by Dr. Rebhan, a family practitioner. Dr. Rebhan performed a physical examination and an electrocardiogram (EKG).[3] The EKG revealed a normal sinus rhythm without acute wave changes. Dr. Rebhan prescribed a cholesterol-lowering medication and advised William to begin a daily aspirin regimen. Dr. Rebhan also scheduled William for an exercise stress test.

¶ 12. The exercise stress test was administered on April 1, 2004, and consisted of an EKG before, during,

---

[3] An EKG (also known as an ECG) is "[a] record of the variations in electric potential which occur in the heart as it contracts and relaxes." *Black's Medical Dictionary* 226 (Dr. Harvey Marcovitch ed., 41st ed. 2006). An EKG is "recorded by connecting the outside of the body by electrodes with an instrument known as an electrocardiograph.... The normal electrocardiogram of each heartbeat shows one wave corresponding to the activity of the atria and four waves corresponding to the phases of each ventricular beat." *Id.*

and after treadmill exercise. In addition, a nuclear isotope was injected into William's body to measure his blood flow both at rest and with stress.

¶ 13. The results of the nuclear scan were interpreted by Dr. Borgnes, a radiologist, as showing a mildly enlarged left ventricle and a small fixed defect consistent with an old infarct.[4]

¶ 14. Upon receiving the results of the exercise stress test, Dr. Rebhan prescribed nitroglycerin and referred William to Dr. Jenny, a cardiologist, for further evaluation. Dr. Jenny interpreted the results of William's EKG and performed a physical examination and chest x-ray on April 7, 2004. According to Dr. Jenny, William's resting EKG was normal, but his EKG under stress demonstrated "definitive convincing evidence of ischemia."[5] Further observing that William's chest x-ray was "unremarkable," Dr. Jenny ultimately opined that William suffered from "[p]robable musculoskeletal chest wall pain."

¶ 15. On June 25, 2004, William returned to Dr. Rebhan for a physical examination. William expressed no specific concerns at that time but advised that he continued to experience occasional chest pain while exercising. Noting that William's chest pain was "ruled out from a cardiac standpoint," Dr. Rebhan referred William to a physical therapist.

---

[4] An "infarction" is defined as "[t]he changes in an organ when an artery is suddenly blocked, leading to the formation of a dense, wedge-shaped mass of dead tissue in the part of the organ supplied by the artery." *Black's Medical Dictionary, supra* note 3, at 362.

[5] "Ischaemia" is defined as "[b]loodlessness of a part of the body, due to contraction, spasm, constriction or blocking (by embolus or by thrombus) of the arteries: for example, of the heart." *Black's Medical Dictionary, supra* note 3, at 381.

¶ 16. The physical therapist evaluated William on August 27, 2004, but detected "[n]o signs of musculoskeletal impairment."

¶ 17. Upon receiving the physical therapist's report, Dr. Rebhan suggested that William's chest pain may be related to acid reflux and so directed William to take heartburn medication for a ten-day trial period.

¶ 18. On September 9, 2004, William telephoned Dr. Rebhan's office, complaining that the heartburn medication did not help. Dr. Rebhan responded the next day, advising that William's chest pain was "[m]ost likely musculoskeletal."

¶ 19. William Weborg died on September 26, 2004, prior to his next scheduled appointment with Dr. Rebhan. The Door County Medical Examiner determined that William's cause of death was "severe coronary artery disease due to arteriosclerotic cardiovascular disease (hardening of the arteries)."

## II. PROCEDURAL POSTURE

¶ 20. On March 6, 2007, the Weborgs filed a medical malpractice action against the physicians, claiming that William died as a result of the negligence of Dr. Jenny, Dr. Borgnes, and Dr. Rebhan. The Weborgs sought damages for pain and suffering endured by William, funeral and burial expenses incurred by William's estate, and pecuniary losses and the loss of society and companionship sustained by William's surviving wife and three sons.

¶ 21. On September 8, 2009, the physicians filed motions in limine, seeking, *inter alia,* an order permitting the physicians to introduce at trial evidence of collateral source payments, namely, life insurance proceeds and social security benefits received by Theresa

Weborg as a result of her husband's death. The physicians argued that Wis. Stat. § 893.55(7), clarified by this court in *Lagerstrom v. Myrtle Werth Hospital-Mayo Health System,* 2005 WI 124, 285 Wis. 2d 1, 700 N.W.2d 201, expressly allows evidence of collateral source payments to be introduced in medical malpractice actions.

¶ 22. The Weborgs objected to the physicians' motion at a hearing on September 14, 2009. Relying on *Lagerstrom,* the Weborgs contended that the jury is not permitted to use evidence of collateral source payments to reduce its award of damages, and consequently, Theresa Weborg's receipt of life insurance proceeds and social security benefits has no relevance. In any case, the Weborgs argued, the evidence should be excluded under Wis. Stat. § 904.03 on the grounds of confusion and unfair prejudice.

¶ 23. The physicians countered that "the language of [Wis. Stat. § 893.55(7)] is directory," taking the admission of collateral source payments in medical malpractice actions out of the circuit court's discretion. Furthermore, the physicians maintained, the *Lagerstrom* court specifically mentioned life insurance proceeds as a type of payment encompassed by § 893.55(7).

¶ 24. The circuit court agreed. By a letter decision dated September 17, 2009, the circuit court granted the physicians' motion in limine, permitting the physicians to introduce at trial evidence of collateral source payments, including life insurance proceeds and social security benefits received by Theresa Weborg as a result of her husband's death.

¶ 25. The case proceeded to a jury trial beginning on October 6, 2009. The trial lasted eight days. The evidence of life insurance proceeds and social security benefits was first introduced by the Weborgs' counsel through his direct examination of Theresa Weborg.

Theresa Weborg testified that she received life insurance proceeds as a result of her husband's death and that she and her husband paid premiums for the insurance. She similarly testified that she received $3,300 per month in social security benefits as a result of her husband's death.

¶ 26. The amount of the life insurance proceeds was elicited by counsel for the Injured Patients and Families Compensation Fund through his cross-examination of Theresa Weborg. Theresa Weborg acknowledged that the life insurance proceeds totaled over $1.4 million. She also repeated that she received $3,300 per month in social security benefits.

¶ 27. The jury never heard another mention of the life insurance proceeds or social security benefits.

¶ 28. At the close of the Weborgs' case, the parties informed the circuit court that they had entered into a stipulation in regard to damages. Specifically, the parties stipulated that if the jury finds liability as to one or more of the three physicians, then the Weborgs' damages will be set at exactly $1 million. As part of the stipulation, the Weborgs agreed to dismiss with prejudice their claims against the Injured Patients and Families Compensation Fund.

¶ 29. The physicians then advised the circuit court that pursuant to the parties' agreement, the jury is to be "told nothing" about the stipulation: "[T]he jury will not be told about the stipulation for one thing, that there is a stipulation, and [] they won't be even told that they don't need to find damages." The circuit court twice asked counsel for the Weborgs whether he agreed. Counsel for the Weborgs responded, "Fine with me."

¶ 30. The circuit court entered an order on the stipulation on October 13, 2009.

¶ 31. At the close of the physicians' case, the circuit court conducted a conference on jury instructions. Relevant to this appeal, the physicians requested the circuit court to modify the standard jury instruction on expert testimony, Wis JI—Civil 260,[6] by adding the following emphasized language: "You are not bound by any expert's opinion, *except with regard to the standard of care exercised by medical doctors*." (Emphasis added.) Absent that addition, the physicians argued, Wis JI—Civil 260 is inconsistent with Wis JI—Civil 1023, the standard jury instruction on medical negligence, which instructs that the standard of care, skill, and judgment exercised by medical doctors must be determined from expert testimony.[7]

¶ 32. The Weborgs objected to the modified jury instruction, contending that Wis JI—Civil 1023 does

---

[6] Wisconsin JI—Civil 260 states, in relevant part:

Usually witnesses can testify only to facts they know.

But, a witness with expertise in a calling (specialty) may give an opinion in that calling (specialty). In determining the weight to be given an opinion, you should consider the qualifications and credibility of the expert and whether reasons for the opinion are based on facts in the case. Opinion evidence was admitted in this case to help you reach a conclusion. You are not bound by any expert's opinion.

[7] Wisconsin JI—Civil 1023 states, in relevant part:

You have heard testimony during this trial from doctors who have testified as expert witnesses. The reason for this is because the degree of care, skill, and judgment which a reasonable doctor would exercise is not a matter within the common knowledge of laypersons. This standard is within the special knowledge of experts in the field of medicine and can only be established by the testimony of experts. You, therefore, may not speculate or guess what the standard of care, skill and judgment is in deciding this case but rather must attempt to determine it from the expert testimony that you heard during this trial.

not change the fact that the jury is not bound by any one expert's opinion.

¶ 33. The circuit court agreed with the physicians and granted their request to modify Wis JI—Civil 260. The circuit court explained that the modified jury instruction "just reaffirm[s]" that the jury must rely on expert testimony in order to find that the physicians violated the standard of care.

¶ 34. The jury returned its verdict on October 16, 2009, finding that neither Dr. Jenny, Dr. Borgnes, nor Dr. Rebhan was negligent in his care and treatment of William Weborg. At the same time, the jury found that William was negligent with regard to his own health but that his negligence was not a cause of his death. Pursuant to the parties' stipulation, the jury was not asked any questions pertaining to damages.

¶ 35. On November 5, 2009, the Weborgs filed a motion after verdict, seeking a new trial on the grounds that, *inter alia,* the circuit court erroneously admitted the evidence of life insurance proceeds and social security benefits and erroneously modified the standard jury instruction on expert testimony.

¶ 36. The circuit court denied the Weborgs' motion at a hearing on December 10, 2009. While expressing that the evidence of collateral source payments was unquestionably prejudicial to the Weborgs, the circuit court nevertheless concluded that the evidence was properly admitted, citing both Wis. Stat. § 893.55(7) and *Lagerstrom.* The circuit court further determined that the modified jury instruction was not erroneous or confusing, reiterating its previous ruling that the added language merely rendered Wis JI—Civil 260 consistent with Wis JI—Civil 1023.

¶ 37. Accordingly, on December 10, 2009, December 23, 2009, and January 11, 2010, respectively, the circuit court entered three judgments dismissing the Weborgs' claims against Dr. Rebhan, Dr. Borgnes, and Dr. Jenny.

¶ 38. The Weborgs appealed, and the court of appeals affirmed. *Weborg,* No. 2010AP258, unpublished slip op. The court of appeals assumed, without deciding, that the circuit court erred in admitting the evidence of collateral source payments. *Id.,* ¶ 12. The court of appeals concluded, however, that the error was harmless. *Id.,* ¶¶ 12, 15. To conclude otherwise, the court reasoned, would be to assume that the jury acted improperly by considering evidence of the Weborgs' finances in determining whether the three physicians were negligent. *Id.,* ¶ 15.

¶ 39. The court of appeals agreed with the Weborgs that the circuit court erroneously exercised its discretion in modifying the standard jury instruction on expert testimony. *Id.,* ¶ 30. Again, however, the court of appeals concluded that the error was harmless, explaining that the jury could not have reasonably believed that it was expected to simultaneously adopt conflicting expert opinions on the standard of care.[8] *Id.,* ¶ 30–31.

¶ 40. The Weborgs petitioned this court for review, which we granted on December 1, 2011.

---

[8] The Weborgs appealed to the court of appeals on the additional ground that the circuit court erroneously exercised its discretion in including the optional third paragraph in Wis JI—Civil 1023. *See Weborg v. Jenny,* No. 2010AP258, unpublished slip op., ¶¶ 16–28 (Wis. Ct. App. June 2, 2011). The Weborgs have abandoned that argument before this court, and we therefore do not address it.

## III. STANDARD OF REVIEW

¶ 41. This court will not disturb a circuit court's decision to admit or exclude evidence unless the circuit court erroneously exercised its discretion. *State v. Ringer,* 2010 WI 69, ¶ 24, 326 Wis. 2d 351, 785 N.W.2d 448. " 'A circuit court erroneously exercises its discretion if it applies an improper legal standard or makes a decision not reasonably supported by the facts of record.' " *Johnson v. Cintas Corp. No. 2,* 2012 WI 31, ¶ 22, 339 Wis. 2d 493, 811 N.W.2d 756 (quoting *260 N. 12th St., LLC v. DOT,* 2011 WI 103, ¶ 38, 338 Wis. 2d 34, 808 N.W.2d 372). In this case, the circuit court's decision to admit the evidence of life insurance proceeds and social security benefits was based upon its interpretation and application of Wis. Stat. § 893.55(7). Statutory interpretation and application present questions of law that this court reviews de novo while benefitting from the analyses of the court of appeals and circuit court. *Heritage Farms, Inc. v. Markel Ins. Co.,* 2012 WI 26, ¶ 24, 339 Wis. 2d 125, 810 N.W.2d 125; *Lagerstrom,* 285 Wis. 2d 1, ¶ 24.

¶ 42. A circuit court likewise has broad discretion in instructing a jury. *Nommensen v. Am. Cont'l Ins. Co.,* 2001 WI 112, ¶ 50, 246 Wis. 2d 132, 629 N.W.2d 301. A circuit court appropriately exercises its discretion in administering a jury instruction so long as the instruction as a whole correctly states the law and comports with the facts of the case. *Id.* This court independently reviews whether a jury instruction is a correct statement of the law. *State v. Fonte,* 2005 WI 77, ¶ 9, 281 Wis. 2d 654, 698 N.W.2d 594.

¶ 43. Still, a circuit court's erroneous exercise of discretion does not warrant a new trial if the error was harmless. *See State v. Harris,* 2008 WI 15, ¶ 85, 307 Wis. 2d 555, 745 N.W.2d 397; *Martindale v. Ripp,* 2001 WI 113, ¶ 30, 246 Wis. 2d 67, 629 N.W.2d 698; *State v. Ziebart,* 2003 WI App 258, ¶ 26, 268 Wis. 2d 468, 673 N.W.2d 369. Application of the harmless error rule presents a question of law that this court reviews de novo. *Ziebart,* 268 Wis. 2d 468, ¶ 26.

## IV. ANALYSIS

### A. Admission of the Evidence of Life Insurance Proceeds and Social Security Benefits

¶ 44. Pursuant to the common law collateral source rule, an injured party's recovery cannot be reduced by payments or benefits from sources collateral to, or aside from, the tortfeasor. *Koffman v. Leichtfuss,* 2001 WI 111, ¶ 29, 246 Wis. 2d 31, 630 N.W.2d 201. "The rule is grounded in the long-standing policy decision that should a windfall arise as a consequence of an outside payment, the party to profit from that collateral source is the person who has been injured, not the one whose wrongful acts caused the injury." *Id.* (internal quotations omitted); *see also Ellsworth v. Schelbrock,* 2000 WI 63, ¶ 7, 235 Wis. 2d 678, 611 N.W.2d 764 ("The tortfeasor who is legally responsible for causing injury is not relieved of his obligation to the victim simply because the victim had the foresight to arrange, or good fortune to receive, benefits from a collateral source for injuries and expenses.").

¶ 45. In the context of damages for medical expenses, the collateral source rule permits the plaintiff to recover the reasonable value of medical services, without regard to gratuitous medical services rendered or payments made on the plaintiff's behalf by outside sources, including insurance payments. *Lagerstrom,* 285 Wis. 2d 1, ¶ 56; *Koffman,* 246 Wis. 2d 31, ¶ 30. Stated otherwise, a tortfeasor is liable for the reasonable value of medical services, "without limitation to the amounts actually paid by the victim." *Lagerstrom,* 285 Wis. 2d 1, ¶ 56.

¶ 46. The collateral source rule also operates as an evidentiary rule, precluding the introduction of evidence pertaining to payments or benefits received by a plaintiff from sources collateral to the tortfeasor. *Leitinger v. DBart, Inc.,* 2007 WI 84, ¶ 30, 302 Wis. 2d 110, 736 N.W.2d 1. The rule thereby "protects plaintiffs by guarding against the potential misuse of collateral source evidence to deny the plaintiff [the] full recovery to which he is entitled." *Id.,* ¶ 31.

¶ 47. The collateral source rule ordinarily works in tandem with the legal principle of subrogation. *Lagerstrom,* 285 Wis. 2d 1, ¶ 65; *Koffman,* 246 Wis. 2d 31, ¶ 33. By virtue and to the extent of payments made on behalf of the injured party, the payor, or subrogated party, generally obtains a right of recovery in an action against the tortfeasor and is a necessary party in such action. *Lagerstrom,* 285 Wis. 2d 1, ¶ 64; *Koffman,* 246 Wis. 2d 31, ¶ 33. Alternatively, the payor may waive its right to subrogation in favor of reimbursement. *Lagerstrom,* 285 Wis. 2d 1, ¶ 64. In either case, the policy goals are the same: subrogation helps to ensure

that the loss is ultimately placed upon the tortfeasor and prevents the injured party from being unjustly enriched through a double recovery, i.e., recovery from both the subrogated party and the tortfeasor. *Lagerstrom,* 285 Wis. 2d 1, ¶ 64; *Koffman,* 246 Wis. 2d 31, ¶ 33.

¶ 48. Through its enactment of Wis. Stat. § 893.55(7), the legislature expressly modified the evidentiary aspect of the collateral source rule, while retaining the rights of subrogated parties, in medical malpractice actions. *See Lagerstrom,* 285 Wis. 2d 1, ¶¶ 31, 46. Section 893.55(7) provides:

> Evidence of any compensation for bodily injury received from sources other than the defendant to compensate the claimant for the injury is admissible in an action to recover damages for medical malpractice. This section does not limit the substantive or procedural rights of persons who have claims based upon subrogation.

As this court observed in *Lagerstrom,* § 893.55(7) "is only 50 words long, yet covers a large area of the law of damages in medical malpractice cases." 285 Wis. 2d 1, ¶ 28. Interpreting § 893.55(7) for the first time, *see id.,* ¶ 25, the *Lagerstrom* court concluded that the statute "explicitly allows evidence of collateral source payments to be introduced in medical malpractice actions" but fails to state the purpose for which the evidence of collateral source payments is admissible and fails to direct how the fact-finder may use the evidence of collateral source payments. *Id.,* ¶ 5; *see also id.,* ¶¶ 27, 32, 69.

¶ 49. In *Lagerstrom,* the decedent's surviving wife, individually and as special administrator of the decedent's estate, commenced a medical malpractice action against the Myrtle Werth Hospital, Red Cedar

Clinic, and their insurers, alleging that the decedent died as a result of one of the defendants' physicians negligently inserting a feeding tube into the passageway of the decedent's lungs rather than into his stomach. *Id.,* ¶¶ 9, 15. The defendants conceded that the physician was negligent but denied that his negligence caused the decedent's death. *Id.,* ¶¶ 9–10.

¶ 50. At trial, the plaintiff introduced evidence that the medical services rendered to the decedent were reasonably valued at $89,000. *Id.,* ¶ 17. Over the plaintiff's objection, however, the circuit court permitted the defendants to introduce evidence that the decedent's estate incurred only $755 in out-of-pocket expenses for medical services, while the remaining amount was paid by collateral sources, including Medicare and private insurance. *Id.*

¶ 51. The circuit court instructed the jury that it may, but is not required to, reduce its award for the reasonable value of medical services by the amount of the collateral source payments. *Id.,* ¶ 18. In addition, the circuit court limited the plaintiff's arguments concerning the estate's obligation to reimburse Medicare, permitting the plaintiff to argue only that the estate could, if it wished, voluntarily reimburse Medicare. *Id.,* ¶ 19.

¶ 52. The jury returned a verdict in favor of the plaintiff, finding that the physician's negligence was a cause of the decedent's death. *Id.,* ¶ 10. The jury awarded the plaintiff $20,000 for the pain and suffering endured by the decedent and $35,000 for the loss of society and companionship sustained by the decedent's surviving wife. *Id.,* ¶ 20. The jury further awarded the plaintiff $755 for medical expenses and $0 for funeral expenses incurred by the decedent's estate. *Id.*

¶ 53. The circuit court entered judgment on the jury verdict, and the plaintiff appealed, challenging the constitutionality of Wis. Stat. § 893.55(7). *See id.,* ¶¶ 1, 22. On certification from the court of appeals, *id.,* ¶ 1, this court reversed the judgment entered by the circuit court and remanded the cause to the circuit court for, *inter alia,* a new trial on the issue of medical expenses, *id.,* ¶¶ 7, 100.

¶ 54. The *Lagerstrom* court began its analysis by concluding that the text of Wis. Stat. § 893.55(7) "explicitly allows evidence of collateral source payments to be introduced in medical malpractice actions." *Id.,* ¶ 27. While the *Lagerstrom* appeal concerned only medical expenses, the court acknowledged that § 893.55(7) is not so limited, noting that "the statute appears to encompass all damages in a medical malpractice action . . . ." *Id.,* ¶ 28. The court further acknowledged that § 893.55(7) does not impose any limits upon the type of collateral source payments; rather, the statute, "on its face," appears to contemplate that evidence of all collateral source payments is admissible in medical malpractice actions, including evidence of "payments such as those from federal and state governments, life insurance, income continuation plans, and volunteer services . . . ." *Id.,* ¶ 30. Finally, while noting that § 893.55(7) concerns only "[e]vidence of any compensation for *bodily injury*" (emphasis added), the court concluded that the statute "is broad enough to include wrongful death actions." *Id.,* ¶ 29.

¶ 55. Despite the breadth of Wis. Stat. § 893.55(7), as the *Lagerstrom* court observed, the statute is noticeably silent as to many of the issues that accompany the admission of evidence of collateral source payments, including the purpose for which the evidence may be admitted, how the fact-finder may use

691

the evidence, and whether the plaintiff may introduce evidence of the expenses he or she incurred in acquiring the collateral source payments or evidence of his or her obligations to reimburse the collateral sources. *See id.,* ¶¶ 32–35.

¶ 56. Given the statute's silence on these issues, the court turned to the legislative history of Wis. Stat. § 893.55(7). *See id.,* ¶¶ 37–48. Of note, the court identified an earlier draft of the statute that would have required an award of damages in a medical malpractice action to be reduced by collateral source payments. *Id.,* ¶ 38. The drafting records indicated that the earlier draft was not adopted out of a concern that an offset or reduction in an award of damages would negatively affect the subrogation rights of health insurers. *See id.,* ¶¶ 42–43. Indeed, as adopted, § 893.55(7) expressly provides that "[t]his section does not limit the substantive or procedural rights of persons who have claims based upon subrogation." *See also id.,* ¶¶ 40–43.

¶ 57. Considering the text and legislative history of Wis. Stat. § 893.55(7), the *Lagerstrom* court ultimately concluded that the statute modifies only the evidentiary aspect of the collateral source rule, not the substantive aspect. *Id.,* ¶ 46. That is, in the context of medical expenses, § 893.55(7) modifies, but does not abrogate, the common law collateral source rule that the plaintiff is entitled to recover the reasonable value of medical services, without regard to the amount actually paid by the plaintiff. *See id.,* ¶ 70. The court determined that the jury "may hear evidence of collateral source payments and evidence relevant thereto to determine the reasonable value of the medical services but must not use the collateral source payments as an offset to determine the reasonable value of the medical services." *Id.,* ¶ 76.

¶ 58. An alternative interpretation of Wis. Stat. § 893.55(7), the court reasoned, would impair subrogation rights. *See id.,* ¶¶ 71–73. Applying its holding to the facts in *Lagerstrom,* the court explained:

> If the estate recovers an award for the value of the medical services rendered, the estate would not necessarily have a double recovery because it would have an obligation to reimburse Medicare. . . . Because Medicare may seek reimbursement, to protect Medicare's right of reimbursement the collateral source rule should apply. That is, the fact-finder should be advised of the estate's potential obligation to Medicare and the fact-finder should not reduce an award to the estate by the collateral source payments by Medicare because of the potential obligation to repay Medicare. . . . It does not appear that § 893.55(7) can at the same time allow an offset for collateral source payments, protect the parties to the action, and protect the rights of Medicare, which provided collateral source payments.

*Id.,* ¶ 76. The court further advised that its interpretation of § 893.55(7) obviates the constitutional concerns raised by the plaintiff. *See id.,* ¶ 22.

¶ 59. In *Lagerstrom,* because the circuit court failed to instruct the jury that it must not reduce its award for the reasonable value of medical services by the amount of the collateral source payments, this court reversed the judgment and remanded the cause to the circuit for a new trial on the issue of medical expenses. *Id.,* ¶ 77.

¶ 60. Turning now to the instant case, the Weborgs argue that the circuit court committed reversible error in admitting at trial evidence that Theresa Weborg received over $1.4 million in life insurance proceeds and $3,300 per month in social security benefits as a result of her husband's death. Specifically, the

Weborgs assert that evidence of collateral source payments is admissible under Wis. Stat. § 893.55(7) only if the evidence is relevant. In this case, the Weborgs submit, the evidence of life insurance proceeds and social security benefits "could not have been relevant," even if the determination of damages had remained with the jury. Relying on *Lagerstrom,* the Weborgs reason that the jury would not have been permitted to use the evidence of collateral source payments to reduce its award for the Weborgs' financial loss, and therefore, there was no reason to admit the evidence in the first place.

¶ 61. In response, the physicians maintain that the plain language of Wis. Stat. § 893.55(7) "affirmatively directs" the circuit court to admit evidence of collateral source payments in medical malpractice actions, reflecting a legislative determination that such evidence is "always relevant" in medical malpractice actions.[9] The physicians contend that their interpretation of § 893.55(7) is consistent with the statute's policy objectives as set forth by this court in *Lagerstrom.* Even assuming, *arguendo,* that we agree with the Weborgs that § 893.55(7) contemplates a separate relevancy determination, the physicians assert that, in this case, we should not upset the circuit court's discretionary determination to admit the evidence of life insurance proceeds and social security benefits because the evidence was relevant to the jury's determination of damages. In

---

[9] Citing *State v. Williamson,* 84 Wis. 2d 370, 391, 267 N.W.2d 337 (1978), the physicians alternatively argue that the Weborgs forfeited their right to challenge the circuit court's admission of the evidence of collateral source payments by failing to strike Theresa Weborg's objectionable testimony and by failing to ask for a curative instruction. We disagree. The Weborgs preserved their objection by challenging the physicians' motion in limine at the September 14, 2009, hearing; nothing more was required.

any event, the physicians argue, the court of appeals correctly concluded that the admission of the evidence of life insurance proceeds and social security benefits was harmless.

¶ 62. We agree with the Weborgs that evidence of collateral source payments is admissible under Wis. Stat. § 893.55(7) only if the evidence is relevant. In Wisconsin, "[a]ll relevant evidence is admissible, except as otherwise provided by the constitutions of the United States and the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court." Wis. Stat. § 904.02. At the same time, "[e]vidence which is not relevant is not admissible," § 904.02, with no exception. In other words, irrelevant evidence "must be excluded." 7 Daniel D. Blinka, *Wisconsin Practice Series: Wisconsin Evidence* § 401.1, at 96 (3d ed. 2008). Relevancy, therefore, is the "first hurdle" that any evidence must overcome. *Id.*

¶ 63. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Wis. Stat. § 904.01. Thus, in a medical malpractice action, evidence of collateral source payments is relevant if it is probative of any fact that is of consequence to the determination of damages. *See* Blinka, *supra,* § 401.1, at 96–97. Damages recoverable in a medical malpractice action include pain, suffering, and noneconomic effects of disability; loss of consortium, society, and companionship or loss of love and affection; loss of earnings or earning capacity; medical expenses; and any "[o]ther economic injuries and damages." Wis. Stat. § 893.55(5). For example, in *Lagerstrom,* this court concluded that evidence of collateral source payments may be relevant

to the jury's determination of the reasonable value of medical services. *See* 285 Wis. 2d 1, ¶ 76.

¶ 64. Still, whether a particular piece of evidence is relevant is committed to the sound discretion of the circuit court. *State v. Moran,* 2005 WI 115, ¶ 45, 284 Wis. 2d 24, 700 N.W.2d 884. Contrary to the physicians' suggestion, Wis. Stat. § 893.55(7) does not direct that evidence of collateral source payments is inherently relevant in medical malpractice actions, thereby over-riding the circuit court's discretionary authority. Section 893.55(7) states only that evidence of collateral source payments "is admissible in an action to recover damages for medical malpractice." That evidence of collateral source payments "is admissible" in medical malpractice actions does not mean that evidence of collateral source payments is always relevant in every medical malpractice action. Rather, as this court explained in *Lagerstrom,* § 893.55(7) merely modifies the evidentiary aspect of the collateral source rule. 285 Wis. 2d 1, ¶ 46. That is, in the context of medical malpractice actions, § 893.55(7) renders "admissible" evidence that would otherwise be precluded under the common law collateral source rule, namely, evidence of payments or benefits received by the plaintiff from sources collateral to the tortfeasor. As in any other case, however, "whether such evidence *should be admitted* lies within the discretion of the circuit court." *State v. Doss,* 2008 WI 93, ¶ 75, 312 Wis. 2d 570, 754 N.W.2d 150 (emphasis added). As Professor Blinka explains, the word "admissible" simply refers to a larger "process of regulating the disclosure of evidence to the trier of fact." Blinka, *supra,* § 402.1, at 130.

¶ 65. Moreover, pursuant to Wis. Stat. § 904.03, even relevant evidence "may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The decision to exclude evidence under § 904.03, like the determination of relevancy, rests in the discretion of the circuit court. *State v. Franklin*, 2004 WI 38, ¶ 65, 270 Wis. 2d 271, 677 N.W.2d 276; Blinka, *supra*, § 403.1, at 134.

¶ 66. In this case, we conclude that the circuit court applied an improper legal standard in admitting the evidence of life insurance proceeds and social security benefits and therefore erroneously exercised its discretion. Specifically, the circuit court admitted the evidence of life insurance proceeds and social security benefits without first determining in its discretion whether either piece of evidence was relevant to the jury's determination of damages. In doing so, the circuit court adopted the physicians' interpretation of Wis. Stat. § 893.55(7)—an interpretation that we reject today.

¶ 67. When a circuit court fails to exercise its discretion on the erroneous ground that the discretionary authority does not exist, our ordinary practice is to reverse and remand the cause to the circuit court so that the court may exercise the discretion it previously failed to exercise. *Werner v. Hendree*, 2011 WI 10, ¶ 82, 331 Wis. 2d 511, 795 N.W.2d 423; *Farmers & Merchs. Bank v. Reedsburg Bank*, 12 Wis. 2d 212, 228, 107 N.W.2d 169 (1961). In this case, however, we determine that a remand is unnecessary. We, like the court of appeals, conclude that the circuit court's error in admitting the evidence of life insurance proceeds and social security benefits was harmless.

697

¶ 68. A circuit court's erroneous exercise of discretion in admitting or excluding evidence does not necessarily constitute reversible error. *See Green v. Smith & Nephew AHP, Inc.,* 2001 WI 109, ¶ 96, 245 Wis. 2d 772, 629 N.W.2d 727; *Martindale,* 246 Wis. 2d 67, ¶ 30. Pursuant to Wis. Stat. § 805.18(2), the improper admission of evidence is not grounds for reversing a judgment or granting a new trial unless, after an examination of the entire action, it shall appear that the error "affected the substantial rights of the party" seeking to reverse the judgment or secure a new trial.[10] *See also* Wis. Stat. § 901.03(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."). In order for an error to affect the substantial rights of a party within the meaning of Wis. Stat. § 805.18(2), "there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue." *Martindale,* 246 Wis. 2d 67, ¶ 32; *Nommensen,* 246 Wis. 2d 132, ¶ 52; *see also State v. Harvey,* 2002 WI 93, ¶ 41, 254 Wis. 2d 442, 647 N.W.2d 189 (clarifying that the phrase "reasonable possibility" has the same substantive meaning as the phrase "reasonable probability" used by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 694

---

[10] In its entirety, Wis. Stat. § 805.18(2) states:

No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of selection or misdirection of the jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

(1984)). "A reasonable possibility of a different outcome is a possibility sufficient to 'undermine confidence in the outcome.' " *Martindale*, 246 Wis. 2d 67, ¶ 32 (quoting *State v. Dyess*, 124 Wis. 2d 525, 545, 370 N.W.2d 222 (1985)).

¶ 69. In this case, considering the trial as a whole, we agree with the physicians that the circuit court's error in admitting the evidence of life insurance proceeds and social security benefits did not affect the Weborgs' substantial rights. That is, the admission of the evidence of collateral source payments does not undermine our confidence in the jury's determination that neither Dr. Jenny, Dr. Borgnes, nor Dr. Rebhan was negligent in his care and treatment of William Weborg. The fact that Theresa Weborg received life insurance proceeds and social security benefits as a result of her husband's death was first introduced on the third day of the eight-day trial by counsel for the Weborgs through his direct examination of Theresa Weborg. The amount of the life insurance proceeds was then elicited by counsel for the Injured Patients and Families Compensation Fund through his cross-examination of Theresa Weborg. Neither the life insurance proceeds nor social security benefits were ever mentioned again. Indeed, on the fifth day of trial, at the close of the Weborgs' case, the parties stipulated to the amount of damages. As a result, the physicians made no mention of damages during their case, and neither the Weborgs nor the physicians mentioned damages, let alone the collateral source payments, in their closing arguments. Moreover, pursuant to the parties' stipulation, the jury received no instructions pertaining to damages and was not asked to determine damages; rather, the jury was instructed on and asked to determine only negligence and causation.

In particular, consistent with Wis JI—Civil 1023, the jury was instructed that the standard it must apply in determining if either Dr. Jenny, Dr. Borgnes, or Dr. Rebhan was negligent is whether the respective physician failed to conform to the standard of care. The standard of care, the circuit court explained, is "the degree of care, skill and judgment which a reasonable cardiologist, family practitioner, and general diagnostic radiologist, respectively, would exercise in the same or similar circumstances, having due regard for the state of medical science at the time William Weborg was treated and diagnosed." Thus, in order for us to conclude, as the Weborgs submit, that there is a reasonable possibility that the evidence of collateral source payments contributed to the outcome of the trial, we would have to assume that the jury disregarded its instructions and based its determination that the three physicians were not negligent on evidence that had no bearing on the standard of care. While that may be a possibility, it is not a reasonable one. As the court of appeals aptly noted, *see Weborg,* No. 2010AP258, unpublished slip op., ¶ 15, we must presume that the jury followed the circuit court's instructions. *State v. Johnston,* 184 Wis. 2d 794, 822, 518 N.W.2d 759 (1994); *Curkeet v. Joint Sch. Dist. No. 2,* 159 Wis. 149, 153, 149 N.W. 708 (1914); *State v. Deer,* 125 Wis. 2d 357, 364, 372 N.W.2d 176 (Ct. App. 1985).

### B. Modification of the Standard Jury Instruction on Expert Testimony

¶ 70. "The purpose of a jury instruction is to fully and fairly inform the jury of a rule or principle of law applicable to a particular case." *Nommensen,* 246 Wis. 2d 132, ¶ 36. In short, jury instructions "*explain*

what the law means to persons who usually do not possess law degrees." *Id.* (internal quotations omitted). Jury instructions should therefore "be as clear and simple as reasonably possible." *Id.* Indeed, the validity of the jury's verdict may depend upon it. *Fonte,* 281 Wis. 2d 654, ¶ 15.

¶ 71. In this case, the Weborgs argue that the circuit court committed reversible error in modifying the standard jury instruction on expert testimony. The circuit court modified Wis JI—Civil 260 by adding the following emphasized language: "You are not bound by any expert's opinion, *except with regard to the standard of care exercised by medical doctors.*" (Emphasis added.) The Weborgs contend that the modified jury instruction is inherently inconsistent: while the standard jury instruction informs the jury that it is not bound by any expert's opinion, the modified jury instruction informs the jury just the opposite, namely, that it is bound by an expert's opinion on the standard of care.

¶ 72. The physicians respond that the modified jury instruction accurately states the principles of law applicable to medical malpractice actions. Specifically, the physicians maintain, and the circuit court agreed, that the modified jury instruction merely aligns Wis JI—Civil 260 with Wis JI—Civil 1023, the standard jury instruction on medical negligence, which instructs that the standard of care exercised by medical doctors must be determined from expert testimony.

¶ 73. We conclude that the circuit court erroneously exercised its discretion in modifying the standard jury instruction on expert testimony. We agree with the Weborgs that the modified jury instruction is inherently inconsistent. While Wis JI—Civil 260 instructs the jury that it is "*not bound* by any expert's opinion" (emphasis

added), the modified jury instruction can reasonably be read to suggest that the jury *is bound* by an expert's opinion on the standard of care exercised by medical doctors. It is true, as the physicians point out, that Wis JI—Civil 1023 instructs that the standard of care exercised by medical doctors must be determined from expert testimony. *See* Wis JI—Civil 1023 (providing that the standard of care exercised by medical doctors "is within the special knowledge of experts in the field of medicine and can only be established by the testimony of experts"). However, that the jury must determine the standard of care from expert testimony does not mean that the jury is bound by any one expert's opinion on the standard of care. Rather, by evaluating the qualifications and credibility of each expert, the jury may still accept one expert's opinion on the standard of care over another's. Because the modified jury instruction suggested otherwise, we conclude that the instruction was an incorrect statement of the law.

■■

¶ 74. Again, however, we conclude that the circuit court's error in modifying the standard jury instruction on expert testimony did not affect the Weborgs' substantial rights and was therefore harmless. Jury instructions are evaluated in their entirety, not in isolation. *State v. Paulson,* 106 Wis. 2d 96, 108, 315 N.W.2d 350 (1982). Here, as previously mentioned, the jury was appropriately instructed on the standard for determining medical negligence, in accordance with Wis JI—Civil 1023. In addition, while the modified jury instruction on expert testimony erroneously suggested that the jury is bound by an expert's opinion on the standard of care, the immediately succeeding instruction clarified that the jury is to "weigh the different expert opinions against each other and consider the relative

qualifications and credibility of the experts and the reasons and facts supporting their opinions." Absent any indication to the contrary, we presume that the jury did just that: the jury weighed the different expert opinions on standard of care against each other; accepted certain experts' opinions over others; and ultimately determined that Dr. Jenny, Dr. Borgnes, and Dr. Rebhan each used the standard of care that a reasonable cardiologist, family practitioner, and general diagnostic radiologist, respectively, would exercise in the same or similar circumstances. Accordingly, we are satisfied that there is no reasonable possibility that the circuit court's error in modifying the standard jury instruction on expert testimony contributed to the outcome of the trial.

## V. CONCLUSION

¶ 75. First, we hold that evidence of collateral source payments is admissible under Wis. Stat. § 893.55(7) only if the evidence is relevant. In a medical malpractice action, evidence of collateral source payments is relevant if it is probative of any fact that is of consequence to the determination of damages. In this case, the circuit court admitted the evidence of life insurance proceeds and social security benefits without first determining in its discretion whether either piece of evidence was relevant to the jury's determination of damages. Because the circuit court applied an improper legal standard in admitting the evidence of life insurance proceeds and social security benefits, we conclude that the circuit court erroneously exercised its discretion.

¶ 76. However, considering the trial as a whole, we conclude that the circuit court's error in admitting the evidence of life insurance proceeds and social secu-

rity benefits did not affect the Weborgs' substantial rights and was therefore harmless.

¶ 77. Second, we conclude that the circuit court erroneously exercised its discretion in modifying the standard jury instruction on expert testimony. Again, however, we determine that the error was harmless.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 78. SHIRLEY S. ABRAHAMSON, C.J. (*concurring in part and dissenting in part*). I agree with the majority that the circuit court erred when it granted the physicians' motion in limine and allowed the jury to learn that the plaintiffs received over $1.4 million in life insurance proceeds and $3,300 per month in social security benefits as a result of Mr. Weborg's untimely death. *See, e.g.,* majority op., ¶¶ 7, 66. The evidence was not relevant to any disputed issue in the present case.

¶ 79. I dissent, however, because I cannot assuredly say, as the majority does (¶ 69), that the error does not undermine my confidence in the jury's determination that not one of the three physicians was negligent in the care and treatment of William Weborg.

¶ 80. The proceeds of the life insurance in the present case are unusually large, and jurors would very likely remember these sums. Considering the nature of the error and the evidence in the record supporting a finding of negligence, I conclude that the error affected the plaintiffs' substantial rights and was not harmless.[1]

---

[1] This court has frequently set forth various factors that may be relevant to determining whether a particular error was harmless in a given case. *See, e.g., State v. Jorgensen,* 2008 WI 60, ¶ 23, 310 Wis. 2d 138, 754 N.W.2d 77; *State v. Billings,* 110 Wis. 2d 661, 668–69, 329 N.W.2d 192 (1983).

¶ 81. Reading the majority opinion at ¶¶ 3 and 69, one might think that only one or two questions and answers in a long trial involved life insurance proceeds. Not so.

¶ 82. In fact, the defense pressed evidence about the life insurance proceeds on the jury. The defense fought to introduce the evidence (and still claims the evidence was properly admitted). The defense then meticulously elicited testimony about the proceeds of each life insurance policy, extracting specific dollar amounts relating to each policy. The defense repeatedly drew attention to the numerous, substantial sums Mrs. Weborg had already received as a result of Mr. Weborg's death and hammered home to the jury what to many (including myself) appears to be an unusual and astronomical total. Although the evidence was put before the jury on the third day of an eight-day trial, as the majority explains at ¶ 69, the trial transcript demonstrates the very heavy emphasis the defense placed on the life insurance proceeds.

¶ 83. Here is how the evidence of the life insurance proceeds was presented to the jury. During his direct examination of Mrs. Weborg, the plaintiffs' attorney preemptively introduced evidence that the plaintiffs had received life insurance proceeds and social security benefits due to Mr. Weborg's death, to reduce the possibility of prejudice[2]:

---

[2] It seems clear that the plaintiffs' attorney chose to preemptively introduce the evidence of the plaintiffs' life insurance proceeds and social security benefits in an effort to reduce the potential prejudicial impact of the evidence that the circuit court ruled was admissible. *Cf. Porter v. Vista Bldg. Maint. Servs., Inc.*, 630 So. 2d 205, 206 (Fla. Dist. Ct. App. 1993) ("Plaintiff's counsel's attempt to diminish the prejudicial impact of the damaging evidence did not, contrary to appellee's conten-

[Plaintiffs' Counsel]: You received life insurance proceeds after your husband died, did you not?

Mrs. Weborg: Yes, I did.

[Plaintiffs' Counsel]: You received proceeds from Northwestern Mutual Life Insurance Company. Did you and your husband pay the premiums in order to have that life insurance in force when your husband died?

Mrs. Weborg: Yes, we did.

[Plaintiffs' Counsel]: You also received life insurance from Valley Forge Life Insurance Company. Did you and your husband pay the premiums in order to have that life insurance in force?

Mrs. Weborg: Yes.

[Plaintiffs' Counsel]: You also received life insurance from Crown Life. Did you and your husband pay the premiums in order to have that life insurance in force?

Mrs. Weborg: Yes, we did.

[Plaintiffs' Counsel]: There was also a payment made to you for life insurance from Jackson National Life Insurance Company. Did you and your husband pay the premiums to have that life insurance in force?

---

tions, waive the error, or render the error harmless. A party cannot be penalized for his good-faith reliance on a trial court's incorrect ruling.").

The fact that the plaintiffs' attorney first introduced the evidence does not strengthen the physicians' argument that the evidentiary error was harmless. In fact, the attorney's decision demonstrates just how prejudicial he feared the evidence would be. The plaintiffs' attorney took pains to emphasize that Mrs. Weborg and her husband had paid premiums for these benefits and avoided eliciting the exact dollar figures recovered from the various policies.

Mrs. Weborg: I think that is the life insurance policy through Itasca Systems. When Bill became the owner, he took out that policy, and the company paid that policy, or it was paid through the company.

[Plaintiffs' Counsel]: And then you also received a one-time death benefit from social security; is that correct?

Mrs. Weborg: Yes.

[Plaintiffs' Counsel]: And you also receive is it $3,300 per month from the social security administration?

Mrs. Weborg: Yes.

[Plaintiffs' Counsel]: As a result of your husband's death?

Mrs. Weborg: Yes.

¶ 84. Although the plaintiffs' counsel avoided soliciting information about the exact amount of the proceeds of the life insurance policies, on cross-examination counsel for the Injured Patients and Families Compensation Fund systematically elicited the precise amount of life insurance proceeds the plaintiffs had received:

[Fund's Counsel]: There were several life insurance policies insuring your husband's life, correct?

Mrs. Weborg: Yes, there were.

[Fund's Counsel]: And there are four insurers that made payments to you because of his death, correct?

Mrs. Weborg: Yes.

[Fund's Counsel]: And the first payment you received was for a hundred thousand dollars from Northwestern Mutual, correct?

Mrs. Weborg: Yes.

[Fund's Counsel]: And then you received payment of a little over a million dollars from Crown Life, correct?

Mrs. Weborg: No. It says Valley Forge payment of a million dollars.

[Fund's Counsel]: I'm sorry. I misread it. Let me start from the top. You received a payment of $100,000 on October 10th.

Mrs. Weborg: Yes. That was Northwestern Mutual.

[Fund's Counsel]: Okay.

Mrs. Weborg: And that was—it was an annuity that Bill had bought, and although it was from Northwestern Mutual Life Insurance Company, and I guess that's technically—but it was an annuity. That's a little bit different than insurance.

[Fund's Counsel]: Okay. But in any event, it was a hundred thousand dollars-plus check made out to you?

Mrs. Weborg: Yes.

[Fund's Counsel]: And then you received a payment of $1 million on October 25 of 2004 and that was from Valley Forge Life Insurance Company, correct?

Mrs. Weborg: Yes. And that was the insurance that I mentioned when I was talking to Mr. End that Bill purchased when he purchased the company to insure that—to insure himself, his family, his company in the event of, obviously, his death.

[Fund's Counsel]: But in any event, after he died, you received a check from Valley Forge for over a million dollars?

Mrs. Weborg: Yes, I did.

708

[Fund's Counsel]: And then there was a claim for life insurance benefits made to Crown Life on October 10th of 2004, correct?

Mrs. Weborg: Yes.

[Fund's Counsel]: And they paid out $75,184?

Mrs. Weborg: Yes.

[Fund's Counsel]: And there was also a claim made under a policy issued by Jackson National Life Insurance Company?

Mrs. Weborg: Yes.

[Fund's Counsel]: And that policy paid out a death benefit of $250,000?

Mrs. Weborg: Yes.

[Fund's Counsel]: And all of those life insurance proceeds added together are more than $1,400,000, correct?

Mrs. Weborg: Yes.

[Fund's Counsel]: And then you also receive $3,300 per month from social security?

Mrs. Weborg: Yes, I do. Not me personally, for myself and my children.

¶ 85. The majority rationalizes that the jury was asked to decide the physicians' liability only, not the amount of damages. Thus, the majority asserts that the admitted evidence could have affected the outcome of the trial only if "the jury disregarded its instructions and based its determination that the three physicians were not negligent on evidence that had no bearing on the standard of care." Majority op., ¶ 69.

709

¶ 86. While courts expect juries to follow instruc-
tions, courts also recognize that jurors (like any indi-
vidual or group of individuals processing information)
may misuse information and may succumb to emotion or
bias, either consciously or unconsciously. It is no secret
that evidence can be unfairly prejudicial to a party if it
risks arousing jurors' emotions.[3] Evidence that a plain-
tiff has already recovered a dramatic sum of money
from a collateral source might elicit a variety of emo-
tional reactions in a juror that may directly or sublimi-
nally affect a juror's decision on the issue of liability.[4]

---

[3] Circuit courts may exclude otherwise admissible evidence
"if its probative value is substantially outweighed by the danger
of unfair prejudice . . . ." Wis. Stat. § 904.03.

See also 1 McCormick on Evidence § 185 (6th ed. 2006) ("In
this context, prejudice (or, as the rule puts it, 'unfair prejudice')
does not simply mean damage to the opponent's cause—for that
can be a sign of probative value, not prejudice. Neither does it
necessarily mean an appeal to emotion. Prejudice can arise,
however, from facts that arouse the jury's hostility or sympathy for
one side without regard to the probative value of the evidence.")
(Emphasis added); 7 Daniel D. Blinka, Wisconsin Practice Series:
Wisconsin Evidence § 403.1 (3d ed. 2008) (" 'Unfair prejudice' is
concerned with appeals to illegitimate or improper bases for
decision. . . . The focus . . . is on emotions or factors that are
deemed improper bases for a finding by the trier of fact. To
illustrate, gruesome photos or the inappropriate display of gro-
tesque injuries for the sole purpose of horrifying the trier of fact,
as opposed to edifying it on some point in dispute, are prime
examples of unfair prejudice justifying the exclusion of the
evidence.").

A body of scholarship has developed studying the ways in
which emotions, such as anger, affect jury decision making. See
Reid Hastie, Emotions in Jurors' Decisions, 66 Brook. L. Rev.
991, 1005–06 (2001) (compiling studies).

[4] See Howell v. Hamilton Meats & Provisions, Inc., 257 P.3d
1130, 1135 (Cal. 2011) ("Even if relevant on another issue . . .

710

¶ 87. Indeed, there are several reasons that the introduction of evidence of life insurance proceeds could influence the jury in processing the evidence on negligence and liability. Jurors might feel unsympathetic to the plaintiffs given the substantial "recovery" they have already received. Also, in light of the large life insurance sums involved, jurors might even infer that Mr. Weborg was in poor health, was concerned about impending death, and opted to purchase a large life insurance policy to protect the family's financial security. Or jurors might infer that Mrs. Weborg was avaricious and undeserving of additional monetary compensation, notwithstanding evidence revealing the doctors' negligence.[5] Or jurors might conclude that because the plaintiffs had already received generous compensation for the loss of Mr. Weborg, a finding of negligence would result in unnecessary additional recovery for the plaintiffs and there was no reason to saddle the physicians with liability. All of these emotional reactions and inferences may play a role as jurors view conflicting evidence about negligence and liability.[6]

the probative value of a collateral payment must be 'carefully weigh[ed] . . . against the inevitable prejudicial impact such evidence is likely to have on the jury's deliberations.' " (quoting *Hrnjak v. Graymar, Inc.*, 484 P.2d 599, 604 (Cal. 1971))).

[5] *See* Jennifer Howard, *Alabama's New Collateral Source Rule: Observations from the Plaintiff's Perspective*, 32 Cumb. L. Rev. 573, 575 (2002) ("Just as courts fear that a jury might be more likely to find a defendant liable if he is insured, courts fear that a jury might be more likely to find no liability if they know the plaintiff received some compensation. Courts believe that juries might be prejudiced against a plaintiff who has already received some compensation by believing that the plaintiff is overly litigious or merely greedy.") (Citations omitted.)

[6] The jury was instructed, "Draw your own conclusions and your own inferences from the evidence and answer the ques-

711

¶ 88. I agree with those courts that have recognized the risk that erroneously admitted collateral source evidence can influence a jury on issues of liability depending on the specific facts and circumstances in the case at hand.

¶ 89. For example, in *Gormley v. GTE Products Corp.*, 587 So. 2d 455 (Fla. 1991), the Supreme Court of Florida held that a new trial was warranted when a jury was informed that the plaintiffs had already received insurance proceeds after their house burned down. The court reasoned:

> [I]ntroduction of collateral source evidence misleads the jury on the issue of liability and, thus, subverts the jury process. Because a jury's fair assessment of liability is fundamental to justice, its verdict on liability must be free from doubt, based on conviction, and not a function of compromise. Evidence of collateral source benefits may lead the jury to believe that the plaintiff is trying to obtain a double or triple payment for one injury, or to believe that compensation already received is sufficient recompense.[7]

---

tions in the verdict according to the evidence and my instructions on the law."

Among other instructions, the jury was also instructed that "[t]he standard [of care] is within the special knowledge of experts in the field of medicine and can only be established by the testimony of experts. You, therefore, may not speculate or guess what the standard of care, skill and judgment is in deciding this case but must—but, rather, must attempt to determine it from the expert testimony that you have heard during this trial."

[7] *Gormley v. GTE Prods. Corp.*, 587 So. 2d 455, 458 (Fla. 1991) (internal quotation marks and citations omitted).

In *Cook v. Eney*, 277 So. 2d 848, 850 (Fla. Ct. App. 1973), the court of appeals concluded that evidence of receipt of collateral benefits affected the determination of liability and was preju-

¶ 90. The Supreme Judicial Court of Maine reached a similar conclusion in *Werner v. Lane,* 393 A.2d 1329 (Me. 1978). During a personal injury trial, defense counsel indicated to the jury that the plaintiff was receiving free medical and hospitalization care, which was covered by taxpayer dollars.[8] The court was unwilling to find the error harmless with respect to the issue of liability, stating:

> Defense counsel's statement to the jury respecting the free medical and hospitalization care furnished [the plaintiff] . . . was so highly prejudicial to the plaintiff's case . . . that it cannot be said with any degree of certainty that the jury did not conclude that, since the plaintiff was otherwise being taken care of, there should be no recovery at all against [the defendant], notwithstanding the uncontradicted aspect of the evidence pointing to negligence on the part of the defendant proximately causing the accident.[9]

dicial error, as follows: "It cannot be said with any degree of certainty that the jury did not determine that since the appellant was otherwise being taken care of, there should be no recovery against appellee in tort. The admission of evidence of receipt of other benefits may indeed have led the jury to believe that appellant was trying to obtain a double or triple payment for one injury."

[8] *Werner v. Lane,* 393 A.2d 1329, 1332 (Me. 1978).

[9] *Id.* at 1138. The United States Supreme Court has acknowledged that erroneously admitted collateral source evidence may, under the circumstances of a case, be prejudicial on the issue of liability. *Tipton v. Socony Mobil Oil Co.,* 375 U.S. 34, 37 (1963) ("We disagree with the suggestion of the Court of Appeals that the prejudicial effect of the evidence of other compensation would be restricted to the issue of damages and would not affect the determination of liability.").

Other state courts have reached similar conclusions. *See, e.g., John's Heating Serv. v. Lamb,* 46 P.3d 1024, 1043 (Alaska

¶ 91. In the present case, the life insurance policy proceeds and social security benefits were erroneously admitted at the behest of the defense[10]; the number of

2002) ("[The collateral source rule] precludes the introduction of 'evidence of other compensation on the theory that such evidence would affect the jury's judgment unfavorably to the plaintiff on the issues of liability and damages.' " (quoting *Tolan v. ERA Helicopters, Inc.,* 699 P.2d 1265, 1267 (Alaska 1985))); *Evans v. Breeden,* 330 N.E.2d 116, 118 (Ind. 1975) ("It is held that admission of evidence of benefits from a collateral source tends to prejudice the jury and influence their verdict, not only as to damages, but also as to liability."); *Mickelson v. Montana Rail Link, Inc.,* 999 P.2d 985, 992 (Mont. 2000) (" '[I]ntroduction of collateral source evidence may be much more damaging to a plaintiff's case than just affecting the jury's judgment regarding damages. . . . [S]uch evidence can have an impact upon a jury's verdict on the issue of liability, as well as damages.' " (quoting *Thomsen v. State Dep't of Highways,* 833 P.2d 1076 (Mont. 1992))).

[10] The majority and I agree that the evidence was erroneously admitted. Majority op., ¶¶ 7, 66. Although the legislature deemed collateral source evidence potentially admissible in certain actions when it created Wis. Stat. § 893.55(7), it did not deprive circuit courts of their discretion to bar the admission of irrelevant evidence.

Once it is established that the evidence should have been barred despite Wis. Stat. § 893.55(7), the statute is not relevant to determining whether the evidentiary error was harmless. The statute does not say: "Even if irrelevant collateral source rule evidence is erroneously admitted, the evidentiary error shall be deemed harmless."

Many states, including Alaska, Florida, Indiana, Maine, and Montana (jurisdictions I have cited), have enacted statutes attempting to modify the collateral source rule in various ways. *See* Alaska Stat. § 09.55.548 (2010); Fla. Stat. § 768.76 (2011); Ind. Code § 34-44-1-2 (2011); Me. Rev. Stat. Ann. tit. 24, § 2906 (2000); Mont. Code. Ann. § 27-1-308 (2009). *See generally* James J. Watson, Annotation, *Validity and Construction of State*

714

policies and the sum total of the life insurance proceeds were particularly memorable; and the evidence presented all the risks of prejudice ordinarily associated with collateral source payments. On the basis of the record in the present case, I conclude that the erroneously admitted evidence was not harmless error.

¶ 92. For the reasons set forth, I dissent.

¶ 93. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

■■■■

*Statute Abrogating Collateral Source Rule as to Medical Malpractice Actions,* 74 A.L.R. 4th 32 (1989).

Some of the statutes modify the evidentiary aspect of the collateral source rule, with various limitations. Others modify the substantive component of the collateral source rule, with various limitations. None of the statutes address whether, once a court determines that collateral source evidence was erroneously admitted, the error should be considered harmless.