COURT OF APPEALS
DECISION
DATED AND FILED

March 16, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP5-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF3535

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

FRANKIE J. COVINGTON,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: PEDRO COLON, Judge. *Affirmed*.

Before Dugan, Donald and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Frankie J. Covington appeals the judgment of conviction for five counts of burglary of a building or dwelling as a party to a crime. He argues that the trial court violated his Sixth Amendment rights of

confrontation by limiting his cross-examination of his co-actor in the crimes. We conclude that even if we assume that Covington's cross-examination was improperly limited, any such error was harmless. Accordingly, we affirm.

## BACKGROUND

¶2 Covington was arrested in July 2017 for five residential burglaries in June and July, each involving older residents whose homes were burglarized while they were out working in their yards and the doors to their houses were unlocked. According to the criminal complaint, Covington entered each house, stole valuables, and then escaped in a black Cadillac Escalade driven by Tangela Coward, who was arrested at the same time. At Covington's jury trial in September 2018, the jury heard testimony from victims of all five burglaries, seven law enforcement officers, and Coward. Using that testimony, the State laid out detailed evidence about the burglaries, which occurred on June 22, June 25, June 27, July 8 and July 14, 2017. Because the burglaries took place in the City of Milwaukee and the Village of Wauwatosa, both police departments were involved in the investigation, as well as an investigator with the Milwaukee County District Attorney's Office.

*Police testimony*

¶3 Detective Martin Keck of the Wauwatosa Police Department testified that in the summer 2017, he investigated a string of burglaries with a unique method of operation:

> [T]hey were during the day time. Many of them were to residences that were unlocked. So, typically, a burglary a lot of times you see a kicked in door or a broken window that wasn't the case. And in the incidents the victims were elderly and were present at the house, but out in the yard when the burglaries occurred.

2

….

…Another thing that was unique is, typically, the items that were taken were credit cards or small pieces of jewelry.

¶4 Detective Keck testified that two suspects developed for the burglaries: Covington and Coward. He investigated fraudulent credit card transactions made on the June 25 burglary victim's credit card;[1] he retrieved video surveillance from transactions at Macy's, Victoria's Secret, and a gas station. In reviewing the store surveillance from Macy's, Detective Keck saw Covington and Coward walking around together in the store, and they made two purchases in which Coward presented a credit card to the cashier. He then viewed the surveillance video from Victoria's Secret and again saw Covington and Coward make a clothing purchase, with Coward presenting a credit card.

¶5 After noticing that the woman in the surveillance video was wearing a Milwaukee County Zoo hat, Detective Keck worked with a Milwaukee County Sheriff's deputy who talked to employees at the zoo who identified Coward as an employee there. Detective Keck confirmed Coward's identity when he "looked up a photo of her through police records and found that she did match precisely" the woman in the surveillance images. After identifying Coward by name, he learned from Milwaukee Police that Covington was her associate and he was the owner of a black 2007 Cadillac Escalade. Detective Keck testified that he used the Automated License Plate Reader System (ALPRS),[2] to identify the Escalade

---

[1] Officer Will Kirk of the Wauwatosa Police Department also testified about meeting with the victim of the June 25 burglary and communicating with her as she passed along information from her bank about where the stolen cards were used and at what times.

[2] Wauwatosa employs the ALPRS, which uses cameras on top of squad cars, by the light bar, so that "as the squad car drives around the city every time it recognizes a license plate it takes a picture. And it records the time and the GPS coordinates of where that picture was taken."

registered to Covington.[3] His investigation led him to the Northeastern Wisconsin Pawn Registry System (NEWPRS),[4] which revealed that Coward had pawned items on five or six occasions in June and July 2017 and the items pawned included jewelry from the June 22, June 27, and July 8 burglaries.[5]

¶6 Detective Michael Martin of the Milwaukee Police Department testified that he spoke with a victim of the June 22 burglary, who provided him with a bank statement of "ten fraudulent charges on the credit card" stolen in the burglary. The credit card was used on the same day as the burglary, with purchases in Green Bay at a Walgreens and a Walmart store. He reviewed video footage that correlated with each credit card transaction, and he identified Coward as the person making the transaction inside the store. In the surveillance video from Walmart, Covington is seen in the store with Coward.

¶7 Detective Martin investigated the July 8 burglary; he testified that the victim's credit card was used for three transactions on the day of the burglary at a gas station in Milwaukee. When he reviewed surveillance video provided by the gas station, Detective Martin saw both Coward and Covington during the transactions, with Covington "actually seen using the card." He testified that the video also showed Coward and Covington arrive at the gas station in a black

---

[3] The specific features by which ALPRS recognized Covington's Escalade included "chrome wheels, the chrome trim along the doors, the step to get into the car, the roof rack, the brake lights, the headlights." Additionally, it compared the "the condition of the car; [which is] in neat, good, clean condition. There is no damage."

[4] NEWPRS is a system in which "any time an individual pawns or scraps an item in Wisconsin the business that pays for that item is required by law to register this through the municipality that it's located in and then it's also required to put this online."

[5] Detective Keck testified that Covington also went to a pawn shop on July 7 and July 11. The items he pawned were not connected with the items stolen in the five burglaries.

Cadillac Escalade. Detective Martin also testified about the recovery of two rings stolen in the July 8 burglary.

¶8 Officer Christopher Shorts of the Milwaukee Police Department testified that he investigated jewelry taken in the June 22 burglary; records from two pawn shops showed that Coward sold some of the stolen jewelry on June 24. In the first store, a photo of Coward was taken at the time of sale; in the second store, Officer Shorts identified Coward and Covington in video surveillance. In his investigation of the July 8 burglary, Officer Shorts found two of the rings stolen that day in a NEWPRS pawn shop record, which contained a picture of Coward's Wisconsin identification card and the two rings at issue. Surveillance video footage of the jewelry store's parking lot showed Coward and Covington entering the store on July 8, 2017.

¶9 Detective Kelly Zielinski of the Wauwatosa Police Department testified about his investigation of the June 25 burglary, which included following up on an alternate suspect[6] and sharing surveillance videos from Macy's and Victoria's Secret with Detective Keck. Detective Zielinski testified that his investigation of the June 27 burglary was slowed because the victim was unsure how to get credit card records of the fraudulent activity for the police to pursue. Nevertheless, Detective Zielinski recovered that victim's late wife's wedding rings

---

[6] Detective Zielinski followed up on a lead from the victim that she had seen a suspicious person at the store at which she was shopping shortly before the burglary and that her husband confronted someone while walking their dog on the day of the burglary. Although Covington cross-examined Detective Zielinski on the alternate suspect, Detective Zielinski testified that his investigation did not yield any information. He investigated this lead by going undercover as a shopper in the store and then talking to store management. The victim was a regular customer of the store, and store management remembered her shopping there that day but did not remember anyone following her around.

from the pawn shop the day after the June 27 burglary. In the pawn shop records, Detective Zielinski found a receipt for Coward selling five rings, including these two stolen wedding rings. The detective identified Coward with Covington in the background in surveillance images inside the pawn shop on that day.

¶10    Detective Zielinski took part in the surveillance of Covington on July 14; he testified that he saw Covington getting into the Escalade's passenger seat and Coward getting into the driver's seat. He saw Covington's vehicle parked southbound on North 59th Street just south of Washington Boulevard. He followed the Escalade when it drove to the gas station on North 35th Street, with Coward driving and Covington in the passenger seat. He saw Covington swipe a credit card at the pump to purchase gas for the Escalade and then again for the vehicle of an unknown person. He followed the Escalade when it left the gas station and proceeded to a parking lot; he had a clear view of the Escalade from about 100 to 150 feet away. He observed Covington exit the car, walk over to a dumpster, partially lift the lid, throw something inside it, and return to the Escalade.

¶11    Detective Zielinski followed Covington to the AutoZone store near North 24th Street and West North Avenue; he testified that "we made a dynamic entry … with several, five to six officers, in plain clothes along with MPD and uniformed officers." Inside the store, the detective arrested Covington, who was taken into custody without incident. The search of Covington's pockets showed he had seventy-seven dollars in cash, a three-inch folding knife, and seven or eight credit cards, debit cards, and rewards cards, all bearing the name of the victim of the burglary that occurred thirty minutes earlier that day. Covington was also wearing two bracelets stolen from that burglary. In the search of the Escalade, the

6

police recovered jewelry that the victim identified as stolen from her residence that day.

¶12    Robert Stelter, an investigator with the Milwaukee County District Attorney's Office, testified about the surveillance and arrest of Covington and Coward on July 14.   After getting a warrant to place a GPS tracker on the Escalade, the police followed it into a residential neighborhood near North 60th Street and Washington Boulevard, on the border of Milwaukee and Wauwatosa. Investigator Stelter testified that while parked on North 59th Street, he watched the Escalade parked on the same street, and he then saw Covington walk east on Washington Boulevard toward North 59th Street.  Covington got into the Escalade on the passenger's side and the vehicle drove off.

¶13    Investigator Stelter followed the Escalade using the GPS tracking system to a gas station on North 35th Street, where he observed Covington and the Escalade near the credit card reader at the pump, then watched Covington at the credit card reader for another pump for a different vehicle, and finally saw the Escalade leave.  Investigator Stelter followed the Escalade and observed it pull into a nearby parking lot with a dumpster in it.  The police followed the GPS tracking system that showed the Escalade in the area of North 24th Street and West North Avenue, where Investigator Stelter spotted the Escalade in the parking lot of an AutoZone store.  Investigator Stelter proceeded inside the AutoZone and placed Coward under arrest, at which point she dropped a credit card bearing the name of the victim of that day's burglary.

¶14    Investigator Stelter testified that while they followed the Escalade, Wauwatosa Police had a burglary complaint at a house on North 60th Street, which was a block west of where the Escalade had been parked.  Investigator

7

Stelter testified that the burglary victim reported that her credit cards had been stolen and they had just been used at a gas station on North 35th Street. The times the credit cards were used coincided with the times Covington was seen on video surveillance at the gas station.

¶15 Detective James Short of the Wauwatosa Police Department testified that he made contact with the victim of the July 14 burglary, before she even realized the burglary had happened because he was looking for people gardening in their yards in the neighborhood where the GPS tracking system placed Covington's vehicle. Detective Short returned after the victim called police when she went inside her house and noticed her wallet was missing from her purse, and screens in the back door and window were cut. Detective Short retrieved the victim's wallet from a dumpster in a parking lot, where other officers had watched Covington drop something inside. The wallet was confirmed to belong to the victim.

¶16 Detective Stephen Kirby of the Wauwatosa Police Department testified that he conducted a follow up investigation for the July 14 burglary. He retrieved and reviewed surveillance video footage from the gas station on North 35th Street and identified Covington and the Escalade at the pump and Coward inside the store making a purchase. He testified that the transaction identification numbers matched the store copy of the receipt, a receipt found in the Escalade, and the records from the burglary victim's credit card company.

*Victim testimony*

¶17 The jury also heard testimony from the victims of the five burglaries. One of the victims of the June 22 burglary was working in his rose garden in the front of his house when he saw a black Escalade pass in front of his house and

then shortly thereafter, he saw it in the alley behind his house. The next day, his credit card company informed him that there had been fraudulent purchases on his wife's credit card. When he examined the house, he noticed that his wife's ring, cash, prescription glasses, and his wallet, which contained credit and debit cards, were missing.

¶18    The victim of the June 25 burglary discovered her wallet had been taken while she was gardening in her front yard. In the three-and-a-half hour time period after she returned home from shopping and started gardening until she noticed her missing wallet, her credit cards had been used at two gas stations, Victoria's Secret, and Macy's.

¶19    The victim of the June 27 burglary called the police after his credit card company notified him of unusual use. When he checked where his credit card was stored, he noticed that the card was missing as well as his wife's engagement and wedding ring, and some cash. He testified that the afternoon before the burglary, he had been in the yard planting a new plant and the back door to the house was unlocked.

¶20    The victim of the July 8 burglary was working in his garden when he came inside and immediately noticed that his wallet looked very thin; when he looked inside, $250 in cash and his credit card were gone. During the investigation, the victim discovered that two rings, a couple of gold chains and some old non-working watches were taken from his bedroom dresser.

¶21    The victim of the July 14 burglary was working in her yard when a police detective approached to ask if she had noticed anyone suspicious in the neighborhood. She had not, but when she went inside the house, she discovered her wallet was missing from her purse. She also discovered that someone had cut

the screen to the security door in the back and to the kitchen window; the door had been left ajar. Her wallet contained credit cards and cash; from her credit card company she learned that there were three unauthorized transactions on her credit card. Several days after the burglary, the victim noticed that jewelry was missing from her bedroom. She identified multiple pieces of jewelry from the items recovered after Covington's arrest.

*Coward's testimony*

¶22 The State called Coward to testify to the events of the burglaries. Prior to her taking the stand, the trial court addressed concerns regarding Covington's cross-examination of Coward, who was negotiating a plea agreement with the State. The trial court suggested the State would want a motion *in limine* to exclude testimony "regarding those negotiations. Because they're not in lieu of cooperation or testimony in this case and therefore she is testifying voluntarily." Covington argued that he wanted to cross-examine Coward on the "court record that Ms. Coward had set out her plea multiple times after receiving the State's offer." Trial counsel contended that Coward had received an initial and amended offer, each offer had multiple court appearances that set out her plea date further in the future, and at that time, she was scheduled for a plea date for the week after Covington's jury trial date. Trial counsel argued that this line of questioning was relevant and it "would be used to impeach her mindset to believe that she's going to be receiving an offer based on her testimony here. Whether or not it was a formal offer … based on the record that I have … her charges have not yet been amended" and her case was not resolved.

¶23 The trial court and counsel discussed the offers made to each defendant on the record. Coward's offer was for her to plead to three counts of

burglary, dismiss and read in two counts of burglary, and treat a charge of disorderly conduct while armed as a read in. The prosecutor asserted that Coward had the same "offer whether she testifie[d] or not." Covington's offer expired prior to trial, but his previous offer was to plead guilty to all five counts of burglary and the State would recommend a sentence of fifteen years consecutive to his revocation sentence.

¶24 The prosecutor argued that Covington and Coward's respective offers were "broadly different, widely different because of the totally different roles in all of the burglaries. The one hundred percent different [criminal] records, her having none and him having a record going back to the 1980[s]." The prosecutor continued that "because she [was] not getting anything from the State, she's not receiving a different offer, and she'll testify to that. What my recommendation for her [at this time wasn't] relevant." The prosecutor argued that defense counsel's concerns about Coward's mindset would be addressed if Coward testified that she knows "the State [was] not giving [her] consideration."

¶25 The trial court ruled as follows:

> It doesn't appear that there is any consideration of the testimony.... It is an offer of settlement. Offers of settlement are never required to [unintelligible] through the trial. So I'm going to disallow it. You're not going to be able to go into the offer itself. Since there is no consideration for her testimony at this point. Now, that may have the effect of binding her to that offer in the future, but that's none of your client's concern at this point. That's just a question of fairness for the [c]ourt being considered. So she's going to testify. She's not going to testify about any consideration given.

¶26 Trial counsel again raised concerns about the court record showing the attempts to have Coward enter her plea, which showed "that she has been set numerous times for a plea, but has not entered a plea. And then her plea hearing

happens to be the date after the week after the trial is over." The trial court acknowledged counsel's concern, but stated that because the prosecutor, as "an officer of the Court" indicated that "there is no consideration," then the trial court reiterated its ruling that Covington could not question Coward about the negotiations of her plea.

¶27 Coward testified that she had an open case for five burglary charges after her arrest in July 2017; these were all burglaries she had been charged with committing along with Covington. Coward testified that she understood that her offer from the State on that open case would be the same whether or not she decided to testify.

¶28 Coward's testimony about the burglaries in June and July 2017 then followed. On multiple occasions, Coward drove Covington's black Cadillac Escalade and Covington would tell her to pull over in a neighborhood, he would get out of the car and walk away, and then she would see him waving and "drive to wherever he [was] standing and he would get in the car." She initially did not know what Covington did when he left the car, but she found out he was committing burglaries. When he returned to the vehicle, he came back with things like "a gun, a box full of coins, money," jewelry, and credit cards. On one of the days that she dropped off Covington in a neighborhood, he returned with "a bunch of credit cards" and then later that day, she went shopping with Covington and she bought things at Macy's and Victoria's Secret with credit cards that Covington gave her.

¶29 She dropped Covington off in multiple neighborhoods, including those near the June 25, June 27, July 8, and July 14 burglaries. At two of the drop off points, she remembered seeing older people working in their yards. Coward

testified that she went multiple times to pawn shops with Covington to sell jewelry. She identified paperwork from two pawn shops showing sales she made of items given to her by Covington. Coward identified herself and Covington in trial exhibit photographs taken from surveillance video footage at gas stations, stores, and pawn shops.

¶30 Coward testified that on the day of her arrest, Covington exited the vehicle and walked away. Coward waited in the vehicle for twenty to twenty-five minutes, and when he returned, "[h]e came back with a bunch of jewelry, cards, wallets, and stuff like that."

¶31 On cross-examination, Coward reviewed images from her visits to the pawn shops with Covington and testified that she stood closer to the cashier, her name appeared as the seller of the jewelry, and that Covington never used his ID during pawn shop transactions. She testified that she only drove Covington's Escalade when she was with him, she never had her own keys to the vehicle, and he never let her use the vehicle by herself. Coward testified that she felt forced to purchase items at Macy's when she shopped using a stolen credit card with Covington, but she admitted that she did not "run away" from him. She testified that she never saw Covington enter someone's home. She testified that when she asked Covington where he got the credit cards, he told her that "some people that do[] drugs brought them to him."

¶32 Trial counsel then attempted to question Coward about the status of her own case. She asked Coward about her earlier testimony about not getting a deal or consideration for her testimony, to which Coward replied, "Correct." Trial counsel then asked Coward if she was "currently, being charged with burglaries" and she replied, "Yes." Trial counsel stated that she had "a copy of [Coward's]

13

certified record of court records—." The prosecutor interjected that she wanted "to object," but instead, she "just ask[ed] for a side bar." After a side bar, trial counsel withdrew her line of questioning and instead questioned Coward if she ever told "the officers, during [her] interview, that [she] saw [Covington] with [her] eyes, saw him enter into other people's homes and saw him take other people's items out of their home?" Coward replied that "No, [she] didn't see him inside of a house."

¶33 The jury returned a verdict of guilty for Covington on burglary as party to a crime as charged in counts one through five of the information. Prior to sentencing, Covington filed a motion to vacate the verdict on the grounds that he was denied his Sixth Amendment right to fully cross-examine Coward and that he was denied his Fourteenth Amendment right to due process. The trial court denied Covington's motion and proceeded to sentencing. This appeal follows.

## DISCUSSION

¶34 Covington argues that the trial court erred when it denied him a right to confront Coward about her plea negotiations. The trial court explained that it limited Covington's questions based on the State's representation that Coward would get the same deal whether she testified or not; therefore, her plea agreement was not relevant. Covington asserted that Coward's mindset or belief that her testimony may affect her plea agreement made it relevant for cross-examination even if there was no formal consideration in her offer.

¶35 "Limiting cross-examination is limiting the introduction of evidence." *State v. Rhodes*, 2011 WI 73, ¶22, 336 Wis. 2d 64, 799 N.W.2d 850. We will not disturb the trial court's "decision to admit or exclude evidence unless the [trial] court erroneously exercised its discretion." *Weborg v. Jenny*, 2012 WI

67, ¶41, 341 Wis. 2d 668, 816 N.W.2d 191.  In reviewing a discretionary determination, we consider "whether the [trial] court 'reviewed the relevant facts; applied a proper standard of law; and using a rational process, reached a reasonable conclusion.'"  *Rhodes*, 336 Wis. 2d 64, ¶22 (citation omitted).  An erroneous exercise of discretion by the trial court does not warrant a new trial if the error was harmless.  *State v. Harris*, 2008 WI 15, ¶85, 307 Wis. 2d 555, 745 N.W.2d 397.

¶36    "[A] reviewing court should reverse the [trial] court if it determines that the discretionary decision to limit cross-examination did not rely on the appropriate and applicable law."  *Rhodes*, 336 Wis. 2d 64, ¶25 (citing *State v. McCall*, 202 Wis. 2d 29, 36 & n.5, 549 N.W.2d 418 (1996)).  Here, the "appropriate and applicable law" is the Confrontation Clause of the Sixth Amendment.  *See Rhodes*, 336 Wis. 2d 64, ¶25.  "Whether the [trial] court relied on the appropriate and applicable law is, by definition, a question of law that we review de novo."  *Id.*

¶37    "The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'"  *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986).  "Confrontation means more than being allowed to confront the witness physically"; the "primary interest" the confrontation clause secures "is the right of cross-examination."  *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (citation omitted).  The Confrontation Clause does not bar a trial court from imposing "reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Van Arsdall*, 475 U.S. at 679.  "[T]he fundamental inquiry in deciding whether the right of confrontation was

violated is whether the defendant had the *opportunity* for effective cross-examination." **State v. Hoover**, 2003 WI App 117, ¶21, 265 Wis. 2d 607, 666 N.W.2d 74.

¶38 Covington argues that the trial court denied him his right to confrontation when it limited his cross-examination of Coward. The State argues that the trial court properly exercised its discretion to exclude the evidence that Covington wanted to elicit on cross-examination and Covington's confrontation rights were not violated. The State further argues that even if the trial court erred, the error was harmless because Covington would have been convicted of the burglaries even if trial counsel had cross-examined Coward on the details of her plea offer.

¶39 For these purposes, we will assume without deciding that Covington's opportunities to cross-examine Coward about her plea negotiations were improperly limited; nevertheless, we conclude that any violation constituted harmless error.[7] When this court analyzes violations of the Confrontation Clause, we undertake a harmless error analysis, during which we consider several factors "including the frequency of the error … the nature of the defense, the nature of the State's case, and the overall strength of the State's case." **State v. Hale**, 2005 WI 7, ¶61, 277 Wis. 2d 593, 691 N.W.2d 637. The reviewing court considers "whether, assuming that the damaging potential of the cross-examination were fully realized, [it] might nonetheless say that the error was harmless beyond a

---

[7] We also conclude that Covington failed to file a reply brief and, therefore, failed to refute the State's arguments and thereby conceded the State's arguments. *See* **Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.**, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (holding that failure to refute an argument constitutes a concession). Nevertheless, in the interest of being complete, we address the merits of Covington's position.

reasonable doubt." *Van Arsdall*, 475 U.S. at 684. The burden is on the beneficiary of the error—here the State—to prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). The harmless error analysis presents a question of law that this court reviews *de novo*. *State v. Jackson*, 2014 WI 4, ¶44, 352 Wis. 2d 249, 841 N.W.2d 791.

¶40 Here, the strength of the State's case makes clear that any error was harmless. The State presented overwhelming evidence that showed Covington's involvement in the five burglaries. *See Hale*, 277 Wis. 2d 593, ¶68. The jury heard from seven law enforcement officers from three jurisdictions about their investigation to identify who was committing these burglaries. Detective Keck's testimony explained how he identified Coward, and how that identification led him to Covington and Covington's Escalade. Investigator Stelter testified that the police investigation led to a judge signing a warrant to place a GPS tracker on the Escalade, which allowed them to catch Covington within thirty minutes of the burglary on July 14. The jury heard from victims of the five burglaries, who each testified about leaving their home unlocked while they were in their yards, and how small, easy-to-carry valuables were taken.

¶41 Although Covington concedes that the evidence that he committed the July 14 burglary was "considerable," he argues that evidence—which included first-hand police observations of Covington in the Escalade, using the July 14 burglary victim's credit cards at a gas station, and being arrested with stolen credit cards and jewelry a mere thirty minutes after the burglary was reported—is not representative of the evidence regarding the other four burglaries. Covington argues that the State only directly connected Covington to the other four burglaries

through Coward's testimony. This argument fails because the trial record refutes his claim.

¶42    The evidence in the record supporting the other four burglaries was circumstantial but sufficient. The State introduced police testimony that connected Covington to the fraudulent use of credit cards stolen in the June 22 burglary on the same day in Green Bay at Walgreens, Walmart and a gas station, the June 25 burglary on the same day at Macy's and Victoria's Secret, and the July 8 burglary on the same day for three transactions at a gas station in Milwaukee. Covington was captured on surveillance footage when he and Coward used the credit cards stolen in the June 22, June 25, July 8, and July 14 burglaries. The police testified that Covington was with Coward when she pawned jewelry stolen in the June 22, June 27, and July 8 burglaries. This circumstantial evidence is hardly tenuous and was sufficient for the jury to find Covington guilty of all five burglaries beyond a reasonable doubt. *See State v. Poellinger*, 153 Wis. 2d 493, 501-02, 451 N.W.2d 752 (1990) ("It is well established that a finding of guilt may rest upon evidence that is entirely circumstantial and that circumstantial evidence is oftentimes stronger and more satisfactory than direct evidence.").

¶43    Our inquiry also considers the damaging potential if Covington's cross-examination of Coward on her plea negotiations were allowed to be fully realized. *See Van Arsdall*, 475 U.S. at 684. To determine whether the limitation on cross-examining Coward was harmless, we examine whether the verdict would have been different if the jury had heard additional evidence about the negotiations of Coward's plea agreement. Here, the record shows that the jury knew that Coward was charged with all five of these burglaries and had received a plea offer from the State, but she stated that she was not getting any consideration for her

18

testimony. She testified in detail about her participation in all the burglaries, including driving the Escalade, using stolen credit cards, and pawning stolen jewelry. The State further argues that all of the evidence that came in at trial certainly allowed the jury to infer that Coward was culpable in committing the burglaries and, therefore, biased because she would receive a more favorable plea offer by testifying against Covington.

¶44    The State argues that based on all the evidence at trial that a more extensive cross-examination of Coward about the negotiations of her plea agreement would not have changed the jury verdict because Coward's testimony was thoroughly corroborated by the State's evidence. It asserts that her testimony that she used the credit cards Covington gave her at Macy's and Victoria's Secret was corroborated by the video surveillance footage. Moreover, the video surveillance footage of Coward and Covington using stolen credit cards was admissible without Coward's testimony and, therefore, her testimony was cumulative. Similarly, the pawn shop records linked Coward to the jewelry stolen in the burglaries and the surveillance footage showing Covington with her regardless of her testimony. Further, the State argues that there is no doubt that the jury would have found Coward's testimony about the burglaries credible even if trial counsel had elicited more details about the negotiations of her plea agreement and would have found the evidence sufficient beyond a reasonable doubt to find Covington guilty of the five burglaries.

¶45    We conclude it remains clear beyond a reasonable doubt that the jury would have reached the same verdict even if Coward faced additional cross-examination about the negotiations of her plea agreement. The record shows that the "overall strength" of the State's case rested on overwhelming evidence of Covington's guilt, from both direct and circumstantial evidence; furthermore,

Coward's testimony was thoroughly corroborated. *See **Hale***, 277 Wis. 2d 593, ¶61. The State has shown that any possible error in limiting cross-examination did not contribute to the verdict obtained. Therefore, any error by the trial court was harmless.

> *By the Court.*—Judgment affirmed.

> This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)(5) (2019-20).