COURT OF APPEALS
DECISION
DATED AND FILED

November 15, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP610**

STATE OF WISCONSIN

Cir. Ct. No.  2022TP14

IN COURT OF APPEALS
DISTRICT II

IN RE THE TERMINATION OF PARENTAL RIGHTS TO C.M.R.-W., A PERSON UNDER THE AGE OF 18:

KENOSHA COUNTY DIVISION OF CHILDREN & FAMILY SERVICES,

   PETITIONER-RESPONDENT,

 V.

M.T.W.,

   RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Kenosha County: JODI L. MEIER, Judge.  *Affirmed.*

¶1    NEUBAUER, J.[1] M.T.W., referred to herein by the pseudonym Mary, appeals from an order of the circuit court terminating her parental rights to her daughter, Carrie.[2] Mary also appeals from the court's order denying her postdisposition motion in which she argued that her counsel in the termination proceeding provided ineffective assistance. Mary argues on appeal that the court erred in rejecting her ineffective assistance claims. For the reasons that follow, this court disagrees and affirms the circuit court's orders.

### *Background*

¶2    In July 2019, the State of Wisconsin filed a CHIPS petition under WIS. STAT. § 48.13(10) alleging that Carrie, then seven weeks old, was in need of protection or services. A jury agreed, and the circuit court entered a dispositional order transferring legal custody of Carrie to the Kenosha County Division of Children and Family Services (the County) and physical placement out of Mary's home. The order imposed conditions Mary would need to satisfy before Carrie would be returned to her custody. In 2021, this court affirmed the dispositional order, and the Wisconsin Supreme Court denied review. *State v. M.T.W.*, No. 2021AP420-FT, unpublished slip op. (WI App Aug. 11, 2021), *review denied* (WI Dec. 15, 2021) (No. 2021AP420-FT).

¶3    In March 2022, the County filed a petition to terminate Mary's parental rights. An affidavit from a social worker at the Kenosha County Division of Children and Family Services that accompanied the petition asserted two

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Carrie is also a pseudonym.

grounds for termination: (1) Carrie continued to be in need of protection or services, and (2) Mary had failed to assume parental responsibility for her. *See* WIS. STAT. § 48.415(2), (6). Mary contested the petition and sought a jury trial.[3] Attorney Brian Rolf was appointed to represent her.

¶4 The jury trial was held from August 1-3, 2022. At the conclusion of the trial, the jury found that the County had proven both grounds for termination of Mary's parental rights. The circuit court held a dispositional hearing on September 13, 2022, at the end of which it concluded the County had proven that termination of Mary's parental rights would be in Carrie's best interest.

¶5 Mary appealed to this court, arguing that Rolf had rendered ineffective assistance during the jury trial. Because she had not raised these claims in the circuit court, this court remanded the case so Mary could file a postdisposition motion. After remand, Mary filed her motion, and the circuit court held an evidentiary hearing on July 12, 2023, at which Rolf testified. In a July 31, 2023 oral ruling, the court concluded that Mary had not proven ineffective assistance and denied her motion.

### *Discussion*

¶6 Ineffective assistance claims present mixed questions of law and fact. *State v. Jenkins*, 2014 WI 59, ¶38, 355 Wis. 2d 180, 848 N.W.2d 786. This

---

[3] "Wisconsin has a two-part statutory procedure for the involuntary termination of parental rights." *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856. In the first step, the grounds phase, "the petitioner must prove by clear and convincing evidence that one or more of the statutorily enumerated grounds for termination of parental rights exists." *Id.*; *see also* WIS. STAT. § 48.424(1)(a). In the second step, "the dispositional phase, the court is called upon to decide whether it is in the best interest of the child that the parent's rights be permanently extinguished." *Steven V.*, 271 Wis. 2d 1, ¶27.

court "uphold[s] the circuit court's findings of fact, including the circumstances of the case and the counsel's conduct and strategy, unless they are clearly erroneous." *Id.* "Findings of fact include 'the circumstances of the case and … counsel's conduct and strategy.'" *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95 (citation omitted). Whether counsel's performance meets the legal standard for ineffective assistance is "a question of law that this court decides de novo." *State v. Domke*, 2011 WI 95, ¶33, 337 Wis. 2d 268, 805 N.W.2d 364.

¶7 In Wisconsin, parents in termination proceedings have a right to the effective assistance of counsel. WIS. STAT. § 48.23(2)(b); *State v. Shirley E.*, 2006 WI 129, ¶38, 298 Wis. 2d 1, 724 N.W.2d 623. The test for analyzing ineffective assistance claims set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), applies in termination proceedings. *See A.S. v. State*, 168 Wis. 2d 995, 1004, 485 N.W.2d 52 (1992). Under *Strickland*, to prevail on a claim of ineffective assistance, Mary must prove that Rolf's performance was deficient and that it prejudiced her. *See Strickland*, 466 U.S. at 687. Deficient performance is that which falls below "an objective standard of reasonableness" when evaluated "under prevailing professional norms." *Id.* at 688. To prove prejudice, Mary "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694. If this court finds one of these two prongs has not been met, it need not analyze the other. *State v. Ruffin*, 2022 WI 34, ¶29, 401 Wis. 2d 619, 974 N.W.2d 432.

¶8 In analyzing Mary's arguments, this court's review of Rolf's performance is "highly deferential." *See Strickland*, 466 U.S. at 689; *Harrington v. Richter*, 562 U.S. 86, 105 (2011). This court must attempt "to eliminate the

4

distorting effects of hindsight" and evaluate Rolf's performance "from [his] perspective at the time." *See **Strickland***, 466 U.S. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance …." ***Id.*** "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." ***Id.*** at 690. Counsel's performance "need not be perfect, indeed not even very good, to be constitutionally adequate." ***State v. Thiel***, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted).

*The County's Opening Statement and Witness Testimony*

¶9     Mary raises two ineffective assistance claims related to the County's introduction of evidence concerning the circumstances that led to Carrie being removed from her custody in July 2019, before entry of the CHIPS dispositional order. First, she argues Rolf was ineffective because he did not object when the County described those circumstances in its opening statement. Second, she contends Rolf was ineffective because he did not object when four witnesses called by the County testified about the events that led to Carrie being removed from Mary's custody in July 2019 and to the commencement of the CHIPS proceeding. Because these two claims share a common factual predicate, this court addresses them together.

¶10     Twin Lakes police were summoned to a restaurant on July 10, 2019, in response to reports about a child in distress. During its opening statement, the County said that Carrie "look[ed] very sick, [and was] vomiting and … dehydrated" at the restaurant and that Mary had talked about "cutting her wrists and … trying to snap [Carrie]'s neck." The County then described the CHIPS

proceeding that commenced after Carrie was removed from Mary's custody. The County told the jury that the jury in the CHIPS proceeding found that Carrie had been neglected and that the Wisconsin Supreme Court declined to overturn that verdict.

¶11 The County's first witness, a Twin Lakes police officer, testified about responding to a call about possible child neglect on July 10, 2019 and obtaining information about Carrie's condition and Mary's statements about self-harm from several individuals at the restaurant, which was provided to juvenile crisis workers. Next, two former juvenile crisis workers who were contacted by police testified about their observations of Carrie, communications with Mary and others, and their decision to remove Carrie from Mary's custody and have Carrie examined by a physician. Finally, a Kenosha County Division of Children and Family Services employee testified about his investigation into Carrie's possible neglect and mistreatment after Juvenile Crisis's initial intervention, which ultimately led him to prepare a CHIPS petition.

¶12 At the evidentiary hearing on Mary's postdisposition motion, Rolf agreed that neither ground for termination required the County "to prove specifically [anything] with regards to" the night in July 2019 when Carrie was removed from Mary's custody. When asked why he did not object to the witnesses' testimony about that date, Rolf testified that he understood the testimony to be relevant and admissible under this court's decision in *La Crosse County Department of Human Services v. Tara P.*, 2002 WI App 84, 252 Wis. 2d 179, 643 N.W.2d 194. In *Tara P.*, 252 Wis. 2d 179, ¶13, this court held that evidence of a parent's conduct that occurred before entry of a CHIPS dispositional

order "may be relevant to predicting a parent's chances of complying with conditions [of return] in the future."[4]

¶13 The circuit court concluded the testimony was relevant and Rolf's failure to object was not deficient performance:

> I do find that the facts surrounding this child being detained are relevant per the *Tara P* case. It allows for context or a basis for what conditions are ordered or required to meet, to be met, to reunify, and why.
>
> I think the why's important as well and that's what that testimony allows for. It further allows for context and a basis for what the parent must do to complete conditions of return and why. Also, for what services DCFS has to provide and why.
>
> It's relevant to whether DCFS made reasonable efforts to provide services that were ordered by the [c]ourt. So the first four witnesses did provide foundation for the case, why a condition is necessary, and that's one of the determinations that the jury must make, and whether a condition is met.
>
> ….
>
> So I … don't see that not objecting to all of this was deficient in any way. Further, sometimes when you object as an attorney to bad facts it just brings more attention to them so I note that as well. *Tara P* does allow the evidence for the reasons I've already specified.

¶14 Turning first to the County's opening statement, Mary contends Rolf's failure to object when the County recounted the witnesses' statements to police was deficient performance because the County did not call those witnesses

---

[4] This court also noted in *Tara P.* "that events predating dispositional orders may also be relevant to another issue at termination proceedings: whether a county department of social services made "reasonable" efforts to provide services ordered by a court." *La Crosse Cnty. Dep't of Hum. Servs. v. Tara P.*, 2002 WI App 84, ¶14 n.4, 252 Wis. 2d 179, 643 N.W.2d 194.

at the termination hearing. She also argues the reference to the Wisconsin Supreme Court's decision not to review the outcome of the CHIPS proceeding "improperly created the misleading impression that the appeals were not legally appropriate or permissible." Finally, Mary argues that these portions of the County's opening statement were not relevant under *Tara P.*

¶15 Rolf's failure to object to the County's remarks was neither deficient performance nor prejudicial. As Mary acknowledges in her reply brief, Rolf "could not predict" that the individuals who spoke with police would not end up testifying when the County gave its opening statement. The County listed one of the individuals on its pretrial witness list and reserved the right to call additional witnesses not named on the list. Mary thus relies on the benefit of hindsight in arguing that Rolf should have objected. This court cannot assess his performance through that lens; instead, it must assess the lack of objection from Rolf's "perspective at the time." *See Strickland*, 466 U.S. at 689. From that perspective, Rolf's failure to object does not fall outside "the wide range of reasonable professional assistance." *See id.*

¶16 In addition, though the individuals who spoke to police about Carrie's condition and Mary's statements did not testify, other witnesses testified about their concerns. One of the former juvenile crisis workers testified about arriving at the Twin Lakes Police Department on July 10, 2019, where the individuals had gathered, and obtaining "information about the situation that led to everybody being at the police department which for my understanding was … there were concerns about [Carrie]'s appearance. Possibly being dehydrated, vomiting, [and] sweating." The worker also testified that one individual told her that Mary "had expressed that she wanted to snap the baby's neck before." Similarly, the police officer testified that he heard from Mary and other

8

individuals that Mary "had made statements about cutting her wrists or wanting to cut her wrists." The County's preview of these concerns in its opening statement was supported by this subsequent testimony and further confirms this court's conclusion that Rolf's failure to object was not deficient performance.

¶17 Next, the County's description of the procedural history of the CHIPS proceeding was factually accurate—neither this court nor the Wisconsin Supreme Court reversed the jury's determination that Carrie was in need of protection or services. The County's description of those unsuccessful appeals did not suggest that Mary acted improperly in pursuing them.

¶18 With respect to prejudice, Mary has not established a reasonable probability that the jury would not have found grounds for terminating her parental rights had Rolf objected to the State's remarks. Initially, this court begins by noting that the jurors were instructed before trial began their verdict must rest "solely upon the competent evidence" presented and "that the opening statements are not evidence." This court presumes that jurors follow the instructions they are given. *See* **Weborg v. Jenny**, 2012 WI 67, ¶69, 341 Wis. 2d 668, 816 N.W.2d 191. Thus, it must presume that the jury reached its conclusions based on the evidence presented at trial and not the County's opening remarks. Mary's arguments do not overcome that presumption.

¶19 In addition, the juvenile crisis worker testified as to the observations relayed to the police regarding Carrie's physical appearance. The jury was able to consider that testimony in reaching its verdict. Thus, there is no probability, much less a reasonable probability, that the jury's verdict would have been different had Rolf objected when the County referred to these observations in its opening statement. For these reasons, Mary's first ineffective assistance claim fails.

9

¶20  Turning next to the testimony of the County's witnesses, Mary argues their testimony was not relevant under *Tara P.* because it concerned "the events that led to taking [Carrie] into custody, the request for temporary physical custody, and the CHIPS [d]ispositional [o]rder" and the County's "sole purpose" in presenting it was to inflame the jury against Mary by laying out "the awful facts of the night [Carrie] was taken into custody," including Mary's statements about self-harm and wanting to snap Carrie's neck.  Thus, she argues, Rolf was ineffective for not objecting to it.

¶21  This court disagrees.  Although the jury in this case (unlike the jury in *Tara P.*) was not asked to decide whether there was a substantial likelihood that Mary would comply with conditions of return in the future, the witnesses' testimony was nonetheless relevant to the grounds for termination raised by the County.  First, as to the ground of Carrie's continuing need of protection or services, the County had to prove, among other things, that Mary had not met "the conditions established for the safe return of" Carrie to her home and that the County "has made a reasonable effort to provide the services ordered by the court."  *See* WIS. STAT. § 48.415(2)(a)2.b., 3.  Evidence concerning the circumstances that led to Carrie's removal from Mary's custody was relevant because it helped the jury understand the reasons for the conditions for return and what Mary was required to do to satisfy them.  In addition, to assess the County's efforts to provide the court-ordered services, the jury could consider "the characteristics of the parent or child … the level of cooperation of the parent … and other relevant circumstances of the case."  *See* WIS JI-CHILDREN 324.  Carrie's condition and Mary's behavior before the CHIPS proceeding began were "other relevant circumstances" the jury could consider in evaluating the reasonableness of the County's efforts.

¶22 Likewise, as to the ground of failure to assume parental responsibility, the jury had to consider whether Mary had developed "a substantial parental relationship" with Carrie. *See* WIS. STAT. § 48.415(6)(a). To answer that question, the jury had to consider "the totality of the circumstances throughout [Carrie]'s entire life." *See* WIS-JI CHILDREN 346. Among the factors the jury could consider were "whether [Mary] has expressed concern for or interest in the support, care, or well-being of [Carrie], whether [Mary] has neglected or refused to provide care or support for [Carrie], [and] whether [Mary] exposed [Carrie] to a hazardous living environment." *See **id.***; *see also* § 48.415(6)(b). Testimony about Carrie's condition, Mary's concerning statements about harming herself or Carrie, and the commencement of the CHIPS proceeding was obviously relevant under these legal standards. Among other things, the testimony allowed the jury to "hear[] the complete story" of why Carrie was removed from Mary's custody and to evaluate whether Mary had provided for her care and well-being. *See **Reynaldo F. v. Christal M.***, 2004 WI App 106, ¶¶20-21, 272 Wis. 2d 816, 681 N.W.2d 289. Because the witnesses' testimony was relevant, Rolf's lack of objection did not constitute deficient performance.

*Failure to Cross-Examine Social Worker About Mary's Relationship with Carrie*

¶23 Mary also contends that Rolf provided ineffective assistance because he did not cross-examine the social worker assigned to Carrie's case about Mary's relationship with Carrie. Mary argues that evidence of that relationship, Mary's status as Carrie's sole caretaker, and her interest in Carrie and efforts to develop the parent-child relationship were important in rebutting the County's allegation that Mary had failed to assume parental responsibility.

¶24   At trial, the social worker testified on direct examination about Mary's efforts to comply with the conditions of return following entry of the CHIPS dispositional order. The social worker stated that she reviewed with Mary the condition that Mary have regular contact with Carrie, arranged for Mary to participate in supervised in-person visits, and offered Mary assistance with transportation to and from the visits. According to the social worker, Mary missed or canceled "a large number" of these visits and offered "many different excuses … as to why she couldn't make it." Mary's visits switched from in-person to online after the onset of the COVID-19 pandemic. The social worker testified "that there were a few that [Mary] no-showed or canceled." At the online visits Mary did attend, the social worker reported that she declined to take advice on how to engage with Carrie and that those visits often lasted only five or ten minutes because Carrie "would become distressed or want to disengage."

¶25   When in-person visits became available again in March 2021, Mary's attendance was "[a]lmost nonexistent." In total, Mary attended only four out of approximately fifty scheduled visits with Carrie between March 2021 and April 2022. The social worker summarized the effects of Mary's infrequent contact with Carrie as follows:

> It's very concerning. [Carrie] has been out of the home for the last three years and she's three years old and two months approximately. She does not—I don't believe in my opinion that [Carrie] even knows who [Mary] is and so it would be very concerning to then have to transition to any other types of visits. I believe it would be distressing to [Carrie].

Based on this history, the social worker concluded that Mary had not met the condition of regular contact with Carrie.[5]

¶26    The social worker also testified that Mary had not fully satisfied other conditions for return. For example, the social worker testified that Mary had not verified her ability to provide "sufficient food, clothing, bedding, [and] furniture" to meet Carrie's needs at any time since that condition for return was imposed. She had not attended any of Carrie's doctor appointments. In addition, Mary canceled or "no-showed" multiple meetings with the social worker that were intended to review her progress towards meeting the conditions for return. Finally, Mary did not obtain safe, stable housing after Carrie was removed from her care. According to the social worker, Mary was asked to leave the shelter in which she was living in November 2019 after an incident with another resident, was evicted from the apartment she lived in after leaving the shelter, and later spent time living at a bed bug-infested "rooming house in Waukesha" where she witnessed "frequent criminal activity" and received death threats.

¶27    Rolf's cross-examination of the social worker was brief; he had her confirm that Mary's visits with Carrie changed from one or two-hour in-person visits to fifteen-minute virtual visits because of the pandemic. At the postdisposition hearing, Rolf gave the following answer when asked why he did not question the social worker about Mary's efforts in her relationship with Carrie and whether Mary expressed any interest in Carrie:

---

[5] The social worker also relayed comments from parenting education counselors who had worked with Mary about her "mental health and stability" and their concern "regarding [Mary]'s ability to ever care for a child."

> So there was strategic reasons that we made that were decided upon whilst discussing this amongst myself and others that were assisting me in this matter. When looking at the bulk of the evidence with regards to how those various visits went our decision strategically was to not ask about those specific questions if I remember correctly because of issues that would have arisen that were more negative from our point of view than would have been positive.
>
> They—asking the specifics of what happened during the video visits was also in my opinion somewhat redundant because the argument we were making about the … visits was that it was impossible for them to be effective as a visitation method and thus they were an unreasonable method and that it wouldn't have mattered no matter what.

The circuit court found that Rolf made a strategic decision not to cross-examine the social worker on these points and stated that "[c]ommon sense would dictate that you don't typically get … favorable opinion-type testimony from a witness that's adverse to your client or your case."

¶28 The circuit court's finding renders Rolf's decision not to cross-examine the social worker in an attempt to elicit favorable testimony about Mary's efforts to build a relationship with Carrie "virtually unassailable in an ineffective assistance of counsel analysis." *See State v. Maloney*, 2004 WI App 141, ¶23, 275 Wis. 2d 557, 685 N.W.2d 620, *aff'd*, 2006 WI 15, 288 Wis. 2d 551, 709 N.W.2d 436. Mary has not shown that finding to be clearly erroneous, and this court must therefore accord significant deference to Rolf's decision.

¶29 The social worker made clear in her testimony that she did not believe Mary had made significant efforts to establish regular contact with Carrie or that she had expressed sustained, genuine interest in doing so. Given what he had heard the social worker say during her direct examination, Rolf could reasonably conclude that any follow-up questions he might ask to paint Mary's

efforts and interest in a more positive light would have given the social worker opportunities to restate her negative conclusions or add additional details to support them. His decision not to pursue that line of inquiry was not an error so serious as to constitute deficient performance.

¶30 For these reasons, the circuit court did not err in denying Mary's postdisposition motion.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.